[Civ. No. 14976.   First Dist., Div. One.   May 27, 1952.]

IRWIN FRIEDMAN et al., Appellants, v. R. C. ISEN-
BRUCK et al., Respondents.

Charles M. Stark and Paul W. McComish for Appellants.

Harold B. Lerner for Respondents.

PETERS, P. J.—This action was brought by the lessors to recover from their lessee $7,500 rent claimed to be due and unpaid under the terms of a written lease. A nonsuit was granted as to a second cause of action relating to a different subject matter, and no appeal has been taken from that portion of the judgment. The answer pleaded that the covenant to pay rent had been modified, that during the term of the lease the premises became unusable for the purpose for which they were leased, that the lessors had terminated the lease, and prayed for an apportionment of rent claimed to have been prepaid. The lessee also cross-complained for damages alleged to have been caused by the improper termination of the lease. On the lessors' cause of action, the trial court determined all basic issues in favor of the lessee, held that the rent had been prepaid and that the lessee was entitled to an apportionment, and granted the lessee a judgment for $3,750. No recovery was allowed on the lessee's cross-complaint. The lessors appeal.

### The Facts:

On March 15, 1948, the parties entered into a three-year lease of certain real property located in Mountain View,

California. The lease named Isenbruck as lessee, but granted him the right to assign to a corporation to be formed. The Calibest Canning Company, Inc., was thereafter organized and the lease assigned to it. Located on the leased property were two buildings, one a cannery, and the other a warehouse. The lease is entitled "Lease and Option to Purchase" and expressly provides that the lessee shall use the premises as "a cannery and food processing plant and for no other purpose." It provided a minimum rental of $15,000 per year. For the first year the rent was made payable in installments, $2,500 upon the execution of the lease, $2,500 in 60 days, $2,500 in 120 days, and the balance of $7,500 payable as canning progressed at so much per case. If canning exceeded a certain number of cases the lessors were to receive additional amounts. Admittedly, the lessee paid the first year's rent in precise conformity with the agreement, paying not only the $15,000 minimum, but also some $3,000 additional.

The lease provided that the $15,000 minimum for the second year was payable in full "on or before the 15th day of March, 1949." The present controversy relates solely to the rent for this second year.

In the first week of March, 1949, a meeting was had between representatives of the Calibest Company and the lessors and their attorney. There is some conflict as to what then occurred, but this conflict must be resolved in favor of respondents. Admittedly the parties then discussed the possibility of Calibest buying the property, and a modification as to how the rent should be paid for 1949 was made. Friedman, one of the lessors, stated that he agreed to accept $7,500 on March 15, 1949, and $2,500 at 30-day intervals until the balance was paid. Isenbruck, representing Calibest, testified that Friedman was anxious to sell the property because the rentals were subject to high taxes, while if he sold the property the profit could be treated as a capital gain. Stark, one of the attorneys for the lessors, according to Isenbruck, stated that in order to accomplish this result the existing lease "would probably have to be pretty well torn apart." It was suggested that Stark look over the lease to see what changes should be made. Isenbruck then called attention to the fact that the rent for 1949 would be due in a short time, and suggested, in view of the proposed revision of the lease, that $7,500 instead of $15,000 be paid on March 15, 1949. Friedman, according to Isenbruck, agreed, and fur-

ther agreed that the balance should be payable as in the previous year, and that the whole matter would be discussed again about in April when Isenbruck and Alden, president of Calibest, returned from a contemplated eastern trip.

Under date of March 8, 1949, McComish, attorney associate of Stark's wrote to Isenbruck referring to this meeting "regarding the revamping" of the lease agreement and stating that "it is taking us some time to assemble the necessary figures to the end that the agreement may be properly redrafted." The letter then called attention to the fact that the 1949 rent was due on March 15th, and "Mr. Friedman desires that at least $7,500.00 of the amount due be paid at this time." Isenbruck replied to this letter on March 9, 1949. In this letter he stated that he appreciated "that it would take probably a little longer than originally anticipated to redraft the agreement." In reference to the payment of rent, the letter states that payments, as agreed, will be made "on the same type of arrangements we had last year; we enumerate: $7500.00 to be paid March 15th; $2500.00 May 15th; $2500.00 July 15th; $2500.00 September 15th."

On March 12, 1949, Isenbruck sent to Friedman a check for $7,500, and a letter stating that such payment was "in accordance with our understanding." The letter also states that all reference to rents had been omitted from the check voucher because "to put it on may defeat the purposes, at a later date, of those certain changes being made in contract." Isenbruck and Alden then left on their eastern trip. It is a reasonable inference from this evidence that it was contemplated by all concerned that the 1948 lease would be canceled for a purchase agreement, and that any payments made on the 1949 rent would be applied on the purchase price as provided in the proposed new agreement. Certainly the evidence supports the finding that the parties agreed to modify the lease in reference to payment of rent for 1949.

Some reference should now be made to the physical condition of the cannery building. The lease contains a clause to the effect that by entry thereunder the lessee acknowledged that the premises are "complete and in good order, condition and repair." However, early in 1948 when the cannery was about to be opened, the cannery building needed some major repairs and alterations, which were made at the request of Thomas, superintendent of public works for Mountain View. These repairs were apparently made before the lessee took

possession, and, although the record is not too clear, were apparently paid for by both the lessors and lessee.

Late in March of 1949 the cannery building was seriously damaged by windstorms. Thomas observed repairs being made to the building, without a permit from the city. He was convinced that the building was basically unsafe and should be removed rather than repaired. Thomas gave the superintendent of the cannery a written list of what had to be done to render the building safe, and stated that all such work had to be performed under city permits. Calibest was most anxious to operate at least until the materials on hand were canned. To secure this permission from the city, the superintendent of the cannery wrote to Thomas giving his estimate of how much time would be required to clean up present contracts, agreeing to make no repairs without city permits, and agreeing to make no new contracts for vegetables without city clearance.

The lessors had knowledge of what was going on, and knew that the city officials believed that the cannery building should be torn down. Early in April, Stark had a conversation with Thomas about conditions, and, as a result of this conversation, Thomas, under date of April 12, 1949, wrote to Stark outlining his views. This letter, referring to the cannery building, states:

"At no time, even when new, has this building ever met any of the requirements of any building code or any of the common sense requirements of even 'country' construction. Numerous alterations through the years have further weakened the whole setup.

"Last year, the present tenant was permitted to strengthen and brace the structure against collapse, which was imminent.

"The recent windstorms have again reduced the entire structure to the point of collapse.

"A portion of the building is constructed out over the entire sidewalk area of Jackson Street.

"It is not the purpose of this department to create hardship for any person or firm in the orderly conduct of their daily affairs. We are willing to go along to the point of cleaning up the present tenant's contracts for vegetables, as outlined in his letter of April 7th, but not one day beyond that point.

"This structure cannot be made safe. It must be abandoned and it must be torn down."

Sometime later, probably towards the end of April, Fried-

man also had a talk with Thomas in which Friedman requested that the cannery be permitted to operate until December 31, 1949, promising to tear down and remove the building at that time. Thomas stated orally that if Friedman would post a bond agreeing so to remove the building, and would insure the city against any liability, this could be worked out. This bond and this insurance policy were never furnished by Friedman, he explaining that he and his attorneys waited for the city attorney to draft the appropriate papers, but such was never done. At any rate, Friedman notified the lessee that it could operate until the end of 1949.

Towards the end of April, another windstorm further damaged the building. The city officials then posted the building with notices declaring that the building was unsafe for occupancy and that those who entered it did so at their own risk. There is some dispute over the date of posting but the trial court found, and the finding is supported, that the correct date was May 13, 1949. Both lessors and the lessee knew of the posting, and apparently the lessee knew some time prior to the posting that the city officials were going to declare the building unsafe. On May 12, 1949, a safety engineer for the insurance company writing the workmen's compensation insurance of Calibest examined the building. He testified that his examination disclosed that the building was so badly dilapidated that it needed new walls, a new roof, and new roof trusses and rafters, and that to make it usable it would have to be reconstructed completely. He recommended cancellation of the workmen's compensation policy, which was canceled by a notice dated May 19, 1949. On May 17, 1949, the insurance company carrying the public liability insurance for Calibest canceled its policy because of the condition of the premises. The broker for Calibest tried unsuccessfully to get other companies to carry the risks.

Calibest ceased canning operations on April 26, 1949, and on May 25, 1949, leased some other premises in a nearby city. By the middle of June, Calibest had removed all of its machinery to the new plant. It was stipulated that on June 15, 1949, Calibest tendered possession of the premises to the lessors and vacated them. On July 1, 1949, the lessors served the lessee with a notice to pay rent or to surrender the premises. The notice requested payment of $7,500, the balance claimed to be due on the 1949 rent. Calibest surrendered

the keys to the plant on July 6, 1949, and the next day this action was started by the lessors.

### The Findings

The trial court found that the $7,500 paid on March 15, 1949, was paid pursuant to an oral agreement to modify the rental provisions of the lease as rent for six months in advance; that heavy winds damaged the cannery beyond repair and made it unsafe for occupancy; that about April 5, 1949, the public officials notified the lessors and lessee that the cannery was unsafe for occupancy and must be torn down, but would permit it to continue until the end of the year if the lessors would post a bond; that the lessors did not post such bond; that on May 13, 1949, the public officials posted the building as unsafe for occupancy; that shortly thereafter the compensation and public liability insurance of Calibest were canceled; that under state law it is unlawful to operate a cannery without compensation insurance and the employer must furnish a safe place for the employees to work; that after May 13, 1949, it became impossible for Calibest to use or occupy the premises for any purpose whatever, or to repair the building; that the parties stipulated that on June 15, 1949, Calibest tendered possession of the premises to the lessors and vacated them.

On these findings the court held that Calibest was entitled to a refund of all rent falling due after June 15, 1949, and gave judgment in favor of the lessee for $3,750, half of the $7,500 paid on March 15, 1949.

### Was Calibest Under a Duty to Repair?

The lease contained a clause requiring the lessee to "keep and maintain the said premises . . . in good and sanitary order, condition and repair," and another clause to return them at the termination of the lease in the same condition. Another clause constituted an acknowledgment by the lessee that the premises on the first day of the lease were "in good order, condition and repair." Paragraph fourteen of the lease provided as follows: "That in the event of a partial destruction of the said premises during the said term, from any cause, the Lessor shall forthwith repair the same, provided such repairs can be made within sixty (60) days under the laws and regulations of State, County or Municipal authorities, but such partial destruction shall in nowise annul or void this lease, except that the Lessee shall be entitled to a proportionate deduction of rent while such repairs are

being made, such proportionate deduction to be based upon the extent to which the making of such repairs shall interfere with the business carried on by the Lessee in the said premises. If such repairs cannot be made in sixty (60) days, the Lessor, may, at his option, make same within a reasonable time, this lease continuing in full force and effect and the rent to be proportionately rebated as aforesaid in this paragraph provided. In the event that the Lessor does not so elect to make such repairs which cannot be made in sixty (60) days, or such repairs cannot be made under such laws and regulations, this lease may be terminated at the option of the Lessee. . . . In the event that the building in which the demised premises may be situated be destroyed to the extent of not less than $33\frac{1}{3}\%$ of the replacement cost thereof, the Lessee may elect to terminate this lease, whether the demised premises be injured or not. In the event of a total destruction of the premises, or of the building in which said premises may be situated, or in the event of any dispute between the Lessor and the Lessee relative to the provisions of this paragraph, they shall select an arbitrator . . .''

Appellants urge that, under the terms of the lease, the lessee acknowledged that the premises were in good condition at the inception of the lease and contracted to keep and return them in that condition. It is contended that the lessee failed to perform this duty to repair. ▮ It is then argued that a lessee, by failing to carry out its covenant to repair and allowing the premises to become unfit for occupancy, cannot be permitted to take advantage of its own wrong and thus become discharged from its obligations under the lease. If the premises upon which these arguments are based were sound, the legal conclusion stated would undoubtedly follow. (*Farber* v. *Greenberg,* 98 Cal.App. 675 [277 P. 534] ; *Egan* v. *Dodd,* 32 Cal.App. 706 [164 P. 17].) The difficulty with this argument is that the premises upon which it is based are unsound. It assumes that the lessee's covenant to repair was applicable to the condition here existing. Here the damage was caused by the fundamental nature of the building, and by windstorms. The damage was so extensive that the building could not be repaired but had to be torn down and completely rebuilt. The appellants recognized that fact when they agreed with Thomas that they would remove the building by December 31, 1949, more than a year before the expiration of the lease. The insurance safety engineer testified that, to render the building fit for occupancy, new

walls, a new roof, and new roof trusses and rafters would have to be constructed—in other words, all that could be used of the present building was the concrete floor.

While it is true that at common law and in some states an unqualified covenant to repair was interpreted to impose upon the lessee the duty to rebuild a structure which was destroyed without the fault of the lessee (see annotations 45 A.L.R. 12, 39; 106 A.L.R. 1358, 1364), and while that was perhaps the early rule in California (*Polack* v. *Pioche,* 35 Cal. 416 [95 Am.Dec. 115]), this state no longer follows that harsh and unrealistic doctrine. ■ In *Realty & Rebuilding Co.* v. *Rea,* 184 Cal. 565 [194 P. 1024], the Polack case was distinguished and the more enlightened and modern rule adopted that a covenant to repair does not include an obligation to rebuild a structure destroyed through no fault of the lessee. There the structures involved were destroyed by an accidental fire. The court stated (p. 576) : ''To repair means to mend an old thing, not to make a new thing; to restore to a sound state something which has become partially dilapidated, not to create something which has no existence. [Citing a case.] When we speak of repairing a thing, the very expression presupposes a thing in existence to be repaired. If a workman undertakes to repair an article, he obviously contemplates making whole an existing article and not the manufacture of something new.'' After elaborating on these arguments at some length, the court concluded (p. 578) : ''It follows that the agreements to keep the premises in good repair and, at the end of the term, to surrender them in as good condition as they were in at the beginning of or during the term are not, and do not include, a covenant to replace a structure totally destroyed by fire without the fault of the tenant. [Citing cases.]''

■ That rule is here applicable. Here the building has become unusable for the purposes leased because of its condition at the inception of the lease and because of wind damage. The building cannot be repaired, but has to be torn down and completely rebuilt. That is not the obligation of the lessee. The lessee was under no obligation to rebuild. (Civ. Code, § 1933, subd. 4.)

■ It should also be mentioned that, in the instant case, the obligation to repair does not include the obligation to rebuild even if the strict common law rule were applicable in this state, and that is that the common law rule only applies where the covenant to repair is unqualified. Here

paragraph 14, above quoted, places the duty to rebuild in the case of partial destruction upon the lessors. Certainly if the lessors were obligated to rebuild in the case of the partial destruction of the premises, the parties could not have intended that the lessee had to rebuild after a total destruction. Paragraph 14 necessarily qualifies the covenant to repair.

### Was the Trial Court Justified in Apportioning the Prepaid Rent?

It is a harsh but well settled rule that, in the absence of a qualifying provision in the lease, rent will not be apportioned, that is, where rent is paid in advance, a lawful surrender or termination during the prepaid period does not entitle the lessee to a proportional rebate. Rent does not accrue from day to day, but accrues on the day it is payable. (*Hindin* v. *Caine*, 104 Cal.App.2d 238 [231 P.2d 83]; *Fahrenbaker* v. *E. Clemens Horst Co.*, 209 Cal. 7 [284 P. 905]; *Title Ins. etc. Co.* v. *Amalgamated Oil Co.*, 63 Cal.App. 29 [218 P. 71].) This rule applies where the premises have been destroyed and the lease is thus terminated. (*C. M. Staub Shoe Co.* v. *Byrne*, 169 Cal. 122 [145 P. 1032].)

This rule of nonapportionment of rent is not without exceptions. Thus, if, after prepayment of rent, a lease is terminated because of the fault of the landlord, then a constructive eviction takes place, and the tenant may recover prepaid rent. This exception is predicated on the theory that to permit the lessor to retain all of the prepaid rent, would be to permit him to be unjustly enriched and to profit from his own wrong. (*Johnson* v. *Snyder*, 99 Cal.App.2d 86 [221 P.2d 164].) That exception may well be applicable here. The lessors knew, before the lease was executed in 1948, that the cannery building was in a bad state of repair. They tried to remedy this condition, but, after the windstorms had rendered the building unsafe for occupancy, they took no steps to reconstruct it. They even agreed with Thomas to tear the cannery building down by December 31, 1949. Had they posted the bond required by Thomas, the lessee could, in all probability, have continued to operate for the balance of 1949. While Friedman and his attorney testified that they were waiting for the city attorney to draft the necessary papers, the trial court was not bound by that testimony, and could have reasonably inferred that, had the lessors been a little more aggressive in performing their promises to Thomas, the

building would not have been posted as unfit for occupancy on May 13, 1949. This lessee was engaged in the canning business—a business where contracts for materials to can had to be made in advance. Because of the cancellation of its insurance policies and the posting of the building, which effectively put it out of business, it was forced to cancel several carrot options that it possessed. All of this could have been prevented had the lessors performed their agreement with Thomas. Under such circumstances, it might well be held that the lessee was evicted through the fault of the lessors, and for that reason a constructive eviction took place, and an apportionment is permitted.

There is another reason why the trial court was justified in apportioning the $7,500 paid on March 15, 1949,* and that is that the rule prohibiting apportionment of rent only applies where the covenant to pay rent in advance is unqualified. Here the covenant was not unqualified. Paragraph 14, above quoted, expressly provides for an apportionment of rent in the event of a partial destruction of the premises, and gives the lessee, in such event, the election to terminate. It is inconceivable that, if an apportionment was intended where there is a partial destruction, the parties did not intend an apportionment where the premises became completely unusable through no fault of the lessee. It is broadly, and necessarily, implied that, in such event, an apportionment should result.

The portions of the judgment appealed from are affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

---

*The court apportioned this payment by holding that the lease was terminated June 15, 1949, when a surrender was tendered by the lessee, and that three months' rent had accrued and that the other three months, or $3,750, should be refunded. The court might have found that the lease was terminated on May 13, 1949, when the building was posted. However, this point need not be discussed because the lessee has not appealed.