[Civ. No. 10111.   Third Dist.   Jan. 3, 1962.]

WALLACE R. LYNN et al., Plaintiffs and Respondents, v. DePUE WAREHOUSE COMPANY, Defendant and Appellant.

Cushing, Cullinan, Hancock & Rothert and Killebrew & Hubbard for Defendant and Appellant.

Pelton, Gunther, Durney & Gudmundson and Harold Albert Stone for Plaintiffs and Respondents.

PIERCE, J.—Defendant tenant appeals from a money judgment in favor of plaintiff landlord for damages, towit: a cracking and sagging of the foundation and timbers of leased premises, a warehouse, alleged and found by the trial court to have been caused by (1) breach of the tenant's covenant to repair, and (2) negligence of the tenant.

The occurrence and extent of the damage are not questioned, but defendant contends that it neither breached the lease covenants nor was it negligent.

The tenant, under the terms of the lease, agreed to use the premises for the storage of fertilizer. It accepted the premises "as is" and agreed at its sole cost and expense to "repair and keep in its present state of repair and condition the whole of said premises . . . reasonable and proper use and wear thereof excepted." The covenant to "deliver up" the premises

at the expiration of the term contained the same provision but also excepted "damage by the elements." The lease, in section 11, excepted from the tenant's covenants of repair, defects which were structural. By section 7 of the lease it could be terminated by either party if the premises were totally destroyed *"by fire or other cause."* Said paragraph also provided: "If, however, said premises are only *partially destroyed,* the parties hereto agree *that the lessor shall proceed with all due and reasonable diligence to repair the damage thereto at his own costs and expense* if the same can be reasonably done." [Italics ours.] The provision following said clause was for rent proration in such event during repair.

Defendant took possession January 1, 1956, occupying the premises under this lease until July 1, 1958.

Previous uses by the owner or other tenants had included storage of rice, in connection with which concrete tunnels had been installed, running parallel to one another along the south third of the warehouse. These were a part of a "pot hole drier." These tunnel excavations were uncovered and where they were located the floor joists had also been cut away.

Defendant, to provide itself with greater storage area, covered this space with 1 inch by 12 inch planks. It also, to make the floor more level, and thus prevent its fertilizer bags from tearing, removed blocks which had been in place "between the spacers of the southwest tunnel." Defendant then laid waterproof paper over the entire floor. All of these alterations were with the knowledge and consent of plaintiffs. Thereupon the warehouse was put to its intended use, the storage of fertilizer in paper sacks. After the original storage, fertilizer was shipped out from time to time. During the spring and summer of 1957, the warehouse was nearly empty. Starting in August 1957 it was again loaded during the fall and winter of 1957-1958; the loading was completed by February 6, 1958.

At the original storing the fertilizer bags had been stacked 25 to 28 bags high. The sacks, filled and stacked, are between $5\frac{1}{2}$ and 6 inches thick and, since the rafters of the warehouse are between 16 and 18 feet above the floor, according to the testimony, this would mean that maximum storage height would have been about 3 or 4 feet below the rafters. Each filled sack of fertilizer weighs 81 pounds.

As to the quantum of the load during the winter of 1957-1958 there is a marked conflict. According to defendant the fertilizer was stacked only 20 bags high. On the other hand, according to plaintiff Wallace R. Lynn, when he visited the

warehouse in December 1957 or January 1958 (he was uncertain as to the time) he found ''the building was full, and stacked clear to the rafters.'' This testimony was corroborated, at least in part, by another witness present at the time. With or without corroboration, we must accept it.

In the spring of 1958, defendant's employees observed a sagging of the planking over the pot hole drier tunnels. In June 1958, when the warehouse was emptied and this planking removed, it was found that the foundations thereunder had cracked and sagged, with a similar effect on the timbers. The soil around the damaged footings ''was quite wet'' although the ground around was dry.

During both the first and second winters of the lease, water had collected at the north and south ends of the warehouse. The latter winter had been one of unprecedented rainfall and water had been noticed underneath the warehouse as far as could be observed from the north end (the only part of the building where the understructure permitted observation from outside). We think there is no question, from the testimony, that defendant's employees were aware of a condition of water collecting and remaining under the building during the winter season.

The trial judge, evidenced by his observations at the close of the trial, considered the southwest portion of the premises to be a pocket for rain water created by a spur track running north and south along the west end of the building, intersecting a county road running east and west along the south end; both higher than the adjoining leased premises. Again, and notwithstanding contradictory evidence argued in defendant's brief, the record supports the trial court's understanding.

During the first year of the lease defendant had constructed a drain to carry off this rain water and during the second winter its employees reconstructed the drain and increased its capacity. Defendant's foreman testified that after this additional work was done the water stopped collecting outside and they assumed there was no more water under the warehouse, but they never checked to find out.

As to the cause of the cracking and sagging of the foundation, we note the testimony of the contractor who had been called in to estimate the cost of repair, the witness Young: ''[I]t's a reasonable assumption that something was piled on them to a greater extent than they could support. Interestingly to me, the outside wall of the building was undamaged. It sits on the same type of continuous footing.''

The trial court's finding of defendant's liability is, as stated above, based both upon breach of the tenant's covenants to repair and upon its negligence. The court based its finding of breach of covenant upon the early case of *Polack* v. *Pioche* (1868) 35 Cal. 416 [95 Am.Dec. 115]. There it was held that a general covenant excepting only ''damages by the elements and damages by acts of Providence'' required the tenant to repair even a totally demolished residence where the ''damage'' was caused by failure of a man-made reservoir on upper lands, the tenant being in nowise responsible for the failure.

This case, followed in *Egan* v. *Dodd*, 32 Cal.App. 706 [164 P. 17], has been overruled insofar as it requires a tenant to repair total demolition. (*Realty & Rebuilding Co.* v. *Rea*, 184 Cal. 565 [194 P. 1024]; *Dicker* v. *West*, 164 Cal.App.2d 55 [330 P.2d 106]; *Friedman* v. *Isenbruck*, 111 Cal.App.2d 326, 334 [244 P.2d 718].) We seriously doubt the verity of what is left of the rule of *Polack*, even in *general* repair covenant lease cases. Modern cases show reluctance to place too literal an interpretation on the lessee's covenant to repair. ██ ''The covenant will be reasonably interpreted to avoid placing any unwarranted burden of improvement of the lessor's premises on the lessee.'' (2 Witkin, Summary of California Law, p. 1075.)

It is stated in 1 Tiffany, Real Property (3d ed.) section 102, page 155: ''He [the tenant] is not . . . bound to make repairs of a substantial nature, involving the substitution of new structures, or parts thereof, for old, though these latter be defective and worn out through age.''

And, in this case, while there is a covenant of repair, it is subject to a number of exceptions not in the *Polack* case (e.g., (1) reasonable and proper use and wear, (2) structural defects, and, most important, (3) partial destruction by ''fire or other cause'' is agreed by the lessors to be repaired by them.)

██ Damages from the usual practice and custom in carrying on a business have been held to constitute ''ordinary wear and tear.'' (See cases collected in 45 A.L.R. 70-72, and 20 A.L.R.2d 1354, 1355.) ██ Under the clause obligating the lessor to repair after a partial destruction by ''fire or other cause,'' damage caused by water released by the failure of man-made structures is, under the doctrine of *ejusdem generis*, the same as damage from man-made fire. (*Polack* v. *Pioche, supra; Realty & Rebuilding Co.* v. *Rea, supra.*)

Courts have sometimes placed a strict interpretation on "partial destruction." In the context of use in this lease, we think the damages here constitute partial destruction.

We will not affirm, therefore, that the lessees' repair covenants in this lease would have obligated defendant to repair a damaged foundation, had such damage been caused solely by a nonnegligent accumulation of rain water, even though such accumulation was the result of a man-made obstruction rather than an act of God.

The logical consequence of the trial court's reasoning would be to require the tenant, if the leased premises happened to be located in a swamp created by man-made obstructions, to reclaim that swamp or pay the penalty of repairing damage caused wholly (and without any negligence on his part) by the presence of water.

There is also in this case, however, a finding of defendant's negligence, proximately causing the damage done here and it is unnecessary to rest a decision on breach of covenant.

A tenant is required to use ordinary care in maintaining the leased premises. (Civ. Code, §§ 1928, 1929; *Connell* v. *Brownstein-Louis Co.*, 86 Cal.App. 610 [261 P. 331].)

Contrary to defendant's contention, the record is not without substantial evidence supporting the finding of negligence. And, since this proof was accepted by the trial court, we cannot reweigh it—although actually this is what defendant asks us to do. The recitation of facts above has shown that defendant, with knowledge of an accumulation of water underneath the building and around its foundations, not only permitted it to remain for long periods, but reloaded the warehouse "to its rafters," stacking 81-pound fertilizer sacks to a height materially greater than in the previous year; and this in an area where temporary planking had been laid to serve instead of a regular floor with joists. The spacer-blocks had also been removed. This loading was done without any testing of foundations and timbers to determine whether they could withstand the increased load under the water conditions then existing. The fact that the foundations and timbers which had served for many years did not take this load and that all damage was confined to this heavily-loaded weakened portion of the building is itself evidence which the trial court was entitled to accept as proving exercise of less than ordinary care by defendant.

Defendant contends the court improperly sustained objections by plaintiffs to questions asked by defendant's attor-

ney relating to the customary method of storage in similar warehouses. No foundation had been laid and the court's ruling was proper. Defendant, however, was later permitted to, and did, introduce this evidence. Regarding an objection sustained to offered evidence relating to prior history of use of the warehouse, some of the questions sought answers remote in time (1933) ; as to others no foundation was laid. Actually, considerable evidence of prior use *was* admitted elsewhere in the record, and it appears the subject was fully covered in a rather lengthy trial. We do not find that defendant's defense on the issue of negligence was curtailed.

The judgment is affirmed.

Peek, P. J., and Schottky, J., concurred.