[No. D044896. Fourth Dist., Div. One. Oct. 5, 2005.]

ASP PROPERTIES GROUP, L.P., Plaintiff and Appellant, v.
FARD, INC., Defendant and Respondent.

**COUNSEL**

Smaha & Daley, John L. Smaha, Timothy J. Daley and Christopher R. Mordy for Plaintiff and Appellant.

Christian A. M. Curry for Defendant and Respondent.

**OPINION**

**McDONALD, J.**—Plaintiff ASP Properties Group, L.P. (Landlord) appeals a judgment in favor of defendant Fard, Inc. (Tenant) in Landlord's unlawful detainer action against Tenant. On appeal, Landlord contends: the trial court erred in (1) interpreting the lease and its amendment as not requiring Tenant to install new roofs; and (2) allowing Tenant to rely on affirmative defenses not pleaded in its answer.

## FACTUAL AND PROCEDURAL BACKGROUND

On March 19, 1997, Jim Lin (Landlord's predecessor-in-interest) and Tenant entered into a 10-year lease (Lease) for certain commercial property located on El Cajon Boulevard in La Mesa (Premises).[1] The term of the Lease was from April 1, 1997, to March 31, 2007. Paragraph 3 of the Lease provided that Tenant would use the Premises "for auto sales, repair, auto related business, or other uses . . . ." Paragraph 4 of the Lease provided: "4. REPAIRS AND MAINTENANCE: *Tenant shall maintain at his sole expense* and without contribution from Landlord, *the [P]remises in good and safe condition*, including, but not limited to[,] plate glass, electrical wiring, plumbing and heating installation." (Italics added.)

On July 15, 2000, Lin and Tenant entered into a first amendment to the Lease (Amendment), providing Tenant with a $500 reduction in monthly rent for the remainder of the Lease's term. The Amendment added the following provision to paragraph 3 of the Lease regarding use of the Premises:

"Tenant agrees to comply with any and all requirements, laws, ordinances or other mandates of the City of La Mesa and at Tenant's expense to cure any condition, use or perform any necessary modification, maintenance or repairs as may from time to time be required by the City of La Mesa, or Landlord, within sixty (60) days of receipt of written notice that such a defect, violation

---

[1] The record on appeal is unclear whether Tenant was in possession of the Premises before April 1, 1997. In Landlord's brief, it cites testimony of Lin (its predecessor-in-interest) to support its assertion that Tenant began its possession of the Premises in 1993. However, based on the phrasing of the questions posed, Lin's testimony is not a definitive statement that Tenant began its possession in 1993. At trial, Landlord's counsel asked Lin: "[D]id you own the [Premises] between 1993 and 2003 sir?" Lin replied, "Yes." Landlord's counsel then asked: "[D]uring 1993 and 2003, did the [Premises] have a tenant?" Lin replied, "Yes," and then identified that tenant as Amir Pour (who apparently is the president and/or owner of Tenant). Based on the phrasing of counsel's question, Lin's affirmative answer could mean either that Tenant was in possession of the Premises *at some point* during 1993 and 2003 *or* that Tenant was in possession during that *entire* period. For purposes of this appeal, we assume Tenant entered into possession of the Premises in 1993, albeit not pursuant to the Lease in 1997 or its subsequent amendment in 2000.

or other condition exists which is unacceptable to the City of La Mesa or Landlord. Tenant's failure to make any improvement, correct any condition, or otherwise comply with any written notice shall constitute a breach of this Lease if Tenant permits such condition, violation or use to continue on or after the sixty-first (61st) day after receipt of such notice."

The Amendment also replaced paragraph 4 of the Lease with the following language:

"4. REPAIRS AND MAINTENANCE: *Tenant shall maintain at his sole expense* and without contribution from [L]andlord, *the [P]remises in good and safe condition*, including, but not limited to[,] [the] *roof*, plate glass, electrical wiring, plumbing and heating installation.

"(a) [Tenant] shall comply with any and all zoning regulations, laws, ordinances and other requests of the City of La Mesa concerning the use, repair and maintenance of the [Premises] as set forth in the correspondence received from the City of La Mesa and any future correspondence which concern[s] the use and/or maintenance and repair of the [P]remises. In addition to correcting the existing violation as of the date of [the Amendment], Tenant agrees to submit a plan ('Plan') as requested by the City of La Mesa for the remodel of the building to include, but not [be limited to,] the installation of handicap access and other changes as may be required by the City of La Mesa. Such Plan shall be submitted to Landlord for Landlord's consent prior to Tenant submitting the Plan for approval by the City of La Mesa. After the Plan is approved by the City of La Mesa, Tenant agrees that it shall implement the Plan at Tenant's sole cost and expense, except [that] Landlord agrees that upon approval of the Plan by the City of La Mesa, he shall . . . pay Tenant the sum of $1000.00 as Landlord's contribution [toward] the actual cost of construction required under the approved Plan. Any additional cost or expense in order to implement the Plan, complete the construction or otherwise comply with the Plan or to cure any existing or future violations as noted by the City of La Mesa or Landlord shall be at the sole cost and expense of the Tenant." (Italics added.)

The Amendment also provided: "All other terms and conditions as set forth in the . . . Lease remain in full force and effect except as modified as in this First Amendment."

In 2003 Lin sold the Premises to Landlord. On May 19 Landlord hired Dennis Parra, a building consultant, to inspect the Premises. Among other

observations or deficiencies, Parra found the two roofs of the Premises' buildings were leaking badly and needed to be replaced.[2]

On June 26 Landlord sent Tenant a letter demanding that Tenant complete 11 specific "modifications, maintenance or repairs" within 60 days. On or about November 10 Landlord sent Tenant a "three-day notice" demanding that Tenant complete the modifications, maintenance and repairs or quit its possession of the Premises.

On November 26 Landlord filed the instant unlawful detainer action against Tenant, alleging Tenant did not comply with the three-day notice. Following a bench trial, the trial court entered judgment for Tenant, finding:

"1. That the parties entered into a Lease in 1997 and an amendment to that in 2000.

"2. From the [A]mendment the court gathers that there were some issues with the City of La Mesa, some code violations that were likely cited and that the [L]andlord was concerned that the [T]enant should take care of those issues and that an Amendment was crafted and signed.

"3. In 1978 it appears the roof was put on the building by the testimony of [Landlord's] expert.

"4. The life expectancy of that roof at the outside was 15 years according to that expert. That would take us to 1993.

"5. The [L]ease was not entered into until 1997, already beyond the life expectancy of this roof.

"6. The expert testified this roof could not be repaired, could not be maintained and had to be replaced.

"7. The court does *not* find that the language in Paragraph 4 of the Amendment requiring the [T]enant to maintain in a good and safe condition,

---

[2] Parra's written inspection report stated that: "12. Roof—office building: there is a concrete block parapet wall. The roof is covered with an older built up hot asphalt and gravel surface system. The cap sheet has been repaired around the perimeter where it had cracked at one time. The gravel is very sparse on this roof. There [are] plastic tarps and sheet plastic lying over the roof with some debris holding it down. The roof mounted HVAC equipment has been dismantled. The heating ducts are also dismantled and laying on the roof. There are some penetrations that are still connected. The roof over the carport at the front is in very poor condition with open seams, splits, dried material, and cracks. This roof is leaking badly. . . . This entire roof needs complete tear off, repair of damaged wood, and re-roofing." Parra's report also found the entire roof of the detached shop required the same work.

the roof, among other things, had the same meaning as the [T]enant must replace a roof that had already exceeded its life expectancy at the time [Tenant] took [possession.]" (Italics added.)

The court subsequently issued supplemental findings and a statement of decision, making the following additional findings:

"The [Amendment], drafted in 2000 by [Landlord's] (predecessor's) attorney, provided for [Tenant] to maintain the roof, plate glass, electrical wiring, plumbing and heating installation. The Court does not find that 'maintain' means to replace or to install initially. Thus, the Court finds [Tenant] had no obligation to install a new roof or to install heating or air conditioning. When [Tenant] entered this tenancy, the life of the roof was already expired and no heating or air conditioning had ever been installed. The Court finds these were structural issues and the responsibility of the Landlord, not the Tenant.

"Based upon the testimony of [Landlord's] expert, the Court finds that [Tenant] could not further repair the men's or women's bathroom, a supplemental roof or the exterior until the roof was repaired. The Court finds that [Tenant] repaired/maintained the asphalt and all other requested corrections listed in the June 23, 2003, letter. The Court does not find that the [L]ease and [the Amendment] required [Tenant] to improve or modify anything and everything the Landlord requested. The bargained-for exchange between the parties was that [Tenant] brought the property into compliance with the City of La Mesa's codes and expended $30,000—$50,000 maintaining the leasehold. [¶] . . . [¶]

"The language of the [Amendment] is less than clear and must be construed against the drafter—[Landlord]. The Court will not read into the [A]mendment any more than it states. It does not say that [Tenant] must *replace the roof*. When the [A]mendment was drafted, the testimony of the witnesses was that replacing the roof was not discussed."[3]

Landlord timely filed a notice of appeal.

---

[3] Although Tenant asserts Landlord did not timely request a statement of decision and the trial court erred by issuing its supplemental findings and statement of decision *after* it had entered its judgment, we assume, for purposes of this opinion, that the trial court properly issued its supplemental findings and statement of decision.

## DISCUSSION

### I

*Standards of Review*

■ The trial court's judgment and statement of decision in this case contain both findings of fact and conclusions of law. "We review the trial court's findings of fact to determine whether they are supported by substantial evidence. [Citation.] To the extent the trial court drew conclusions of law based upon its findings of fact, we review those conclusions of law de novo. [Citation.]" (*Westfour Corp. v. California First Bank* (1992) 3 Cal.App.4th 1554, 1558 [5 Cal.Rptr.2d 394].)

■ Under the substantial evidence standard of review, "we must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.] [¶] It is not our task to weigh conflicts and disputes in the evidence; that is the province of the trier of fact. Our authority begins and ends with a determination as to whether, on the entire record, there is *any* substantial evidence, contradicted or uncontradicted, in support of the judgment. Even in cases where the evidence is undisputed or uncontradicted, if two or more different inferences can reasonably be drawn from the evidence this court is without power to substitute its own inferences or deductions for those of the trier of fact, which must resolve such conflicting inferences in the absence of a rule of law specifying the inference to be drawn. . . . [Citations.]" (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630–631 [85 Cal.Rptr.2d 386].) To be substantial, the evidence must be of ponderable legal significance, reasonable in nature, credible, and of solid value. (*Id.* at p. 631; *Oregel v. American Isuzu Motors, Inc.* (2001) 90 Cal.App.4th 1094, 1100 [109 Cal.Rptr.2d 583].) However, substantial evidence is not synonymous with *any* evidence. (*Oregel, supra,* at p. 1100; *Toyota Motor Sales U.S.A., Inc. v. Superior Court* (1990) 220 Cal.App.3d 864, 871 [269 Cal.Rptr. 647].) "The ultimate test is whether it is reasonable for a trier of fact' to make the ruling in question in light of the whole record." (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 652 [51 Cal.Rptr.2d 907].)

■ We generally apply an independent, or de novo, standard of review to conclusions of law regarding interpretation of the Lease and the Amendment. "The precise meaning of any contract, including a lease, depends upon the parties' expressed intent, using an objective standard. [Citations.] When there is ambiguity in the contract language, extrinsic evidence may be considered to ascertain a meaning to which the instrument's language is reasonably susceptible. [Citation.] . . . [¶] We review the agreement and the extrinsic

evidence de novo, even if the evidence is susceptible to multiple interpretations, unless the interpretation depends upon credibility. [Citation.] If it does, we must accept any reasonable interpretation adopted by the trial court. [Citation.]" (*Golden West Baseball Co. v. City of Anaheim* (1994) 25 Cal.App.4th 11, 21–22 [31 Cal.Rptr.2d 378], fns. omitted.) "[W]here . . . the extrinsic evidence is not in conflict, construction of the agreement is a question of law for our independent review. [Citation.]" (*Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 556 [32 Cal.Rptr.2d 676]; see *Schaefer's Ambulance Service v. County of San Bernardino* (1998) 68 Cal.App.4th 581, 586 [80 Cal.Rptr.2d 385] ["[T]o the extent the evidence is not in conflict, we construe the instrument, and we resolve any conflicting inferences, ourselves."].) In contrast, "[i]f the parol evidence is in conflict, requiring the resolution of credibility issues, we would be guided by the substantial evidence test. [Citation.]" (*Appleton, supra,* at p. 556.) However, extrinsic evidence is not admissible to ascribe a meaning to an agreement to which it is not reasonably susceptible. (*Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453 [24 Cal.Rptr.2d 507].)

■ In this case extrinsic evidence on the parties' intended meaning of language in the Lease and Amendment was ultimately *admissible* only if it was relevant to show a meaning to which that language is reasonably susceptible. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37 [69 Cal.Rptr. 561, 442 P.2d 641]; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [6 Cal.Rptr.2d 554].) In *Winet,* we stated: "The decision whether to admit parol [or extrinsic] evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine 'ambiguity,' i.e., whether the language is 'reasonably susceptible' to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is 'reasonably susceptible' to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract. [Citation.]

"Different standards of appellate review may be applicable to each of these two steps, depending upon the context in which an issue arises. The trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.] Thus the threshold determination of ambiguity is subject to independent review. [Citation.]

"The second step—the ultimate construction placed upon the ambiguous language—may call for differing standards of review, depending upon the

parol evidence used to construe the contract." (*Winet v. Price, supra,* 4 Cal.App.4th at pp. 1165–1166.)[4]

■ "[W]e may affirm a trial court judgment on any [correct] basis presented by the record whether or not relied upon by the trial court. [Citation.]" (*Day v. Alta Bates Medical Center* (2002) 98 Cal.App.4th 243, 252, fn. 1 [119 Cal.Rptr.2d 606].) "No rule of decision is better or more firmly established by authority, nor one resting upon a sounder basis of reason and propriety, than that a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason. If right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion." (*Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 [48 P. 117].)

## II

### *Trial Court's Interpretation of the Lease and Amendment*

Landlord contends the trial court erred in interpreting the Lease and Amendment not to require Tenant to install new roofs. Landlord argues Tenant breached the Lease and Amendment by not replacing the roofs of the Premises.

### A

■ "The purpose of the law of contracts is to protect the reasonable expectations of the parties." (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 475 [47 Cal.Rptr.2d 12].) A lease agreement establishing a landlord-tenant relationship is a contract and is subject to the general rules governing the formation and interpretation of contracts. (*Medico-Dental etc. Co. v. Horton & Converse* (1942) 21 Cal.2d 411, 418–419 [132 P.2d 457]; *Vallely Investments v. BancAmerica Commercial Corp.* (2001) 88 Cal.App.4th 816, 822 [106 Cal.Rptr.2d 689].) Formation of a contract requires parties capable

---

[4] *Winet* stated: "When the competent parol [or extrinsic] evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction will be upheld as long as it is supported by substantial evidence. [Citation.] However, when no parol evidence is introduced (requiring construction of the instrument solely based on its own language) or when the competent parol evidence is not conflicting, construction of the instrument is a question of law, and the appellate court will independently construe the writing. [Citation.]" (*Winet v. Price, supra,* 4 Cal.App.4th at p. 1166.) Furthermore, as we noted *ante,* if the extrinsic evidence itself is not conflicting, but "the parties draw conflicting inferences, we will independently draw inferences and interpret the [contract]." (*City of El Cajon v. El Cajon Police Officers' Assn.* (1996) 49 Cal.App.4th 64, 71 [56 Cal.Rptr.2d 723].)

of consent, the consent of those parties, a lawful object, and sufficient consideration. (Civ. Code, § 1550.)[5] "Mutual assent or consent is necessary to the formation of a contract. [Citations.] Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts, and not their unexpressed intentions or understandings. [Citation.] Mutual assent is a question of fact. [Citation.]" (*Alexander v. Codemasters Group Limited* (2002) 104 Cal.App.4th 129, 141 [127 Cal.Rptr.2d 145].)

■ "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties. 'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [§ 1636.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [§ 1639.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," . . . controls judicial interpretation. [§ 1638.]' [Citations.] . . . [L]anguage in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. [Citation.] Courts will not strain to create an ambiguity where none exists. [Citation.]" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18–19 [44 Cal.Rptr.2d 370, 900 P.2d 619].) Interpretation of a contract "must be fair and reasonable, not leading to absurd conclusions. [Citation.]" (*Transamerica Ins. Co. v. Sayble* (1987) 193 Cal.App.3d 1562, 1566 [239 Cal.Rptr. 201].) "The court must avoid an interpretation which will make a contract extraordinary, harsh, unjust, or inequitable. [Citation.]" (*Strong v. Theis* (1986) 187 Cal.App.3d 913, 920–921 [232 Cal.Rptr. 272].) Section 1643 provides: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties." In the event other rules of interpretation do not resolve an apparent ambiguity or uncertainty, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (§ 1654.) "Stipulations which are necessary to make a contract reasonable . . . are implied, in respect to matters concerning which the contract manifests no contrary intention." (§ 1655.)

B

At trial, the court received, at least provisionally, extrinsic evidence on the parties' intended meaning of language in the Lease and Amendment relevant to Tenant's obligation to maintain the two roofs of the Premises. Furthermore,

---

[5] All statutory references are to the Civil Code.

it *may* have admitted some or all of that extrinsic evidence in resolving any ambiguity of language reasonably susceptible to more than one meaning.[6] Accordingly, we first apply an independent standard of review in determining whether the extrinsic evidence in this case shows the language of the Lease or Amendment is ambiguous (i.e., reasonably susceptible to two different meanings). (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co., supra,* 69 Cal.2d at p. 37; *Winet v. Price, supra,* 4 Cal.App.4th at pp. 1165–1166.)

██ In appellate briefs, each party cites certain extrinsic evidence supporting its interpretation of the Lease and Amendment. Because it is not our responsibility to scour the appellate record for evidence to support a party's position, we consider only evidence cited by the parties in independently determining whether the language of the Lease and Amendment is ambiguous regarding Tenant's purported obligation to replace the roofs. In support of Landlord's argument that Tenant was contractually obligated to replace the roofs, Landlord cites extrinsic evidence that in 1997 Tenant knew the roofs needed replacement and, pursuant to the Amendment in 2000, Tenant received a $40,000 rent reduction over the remaining term of the Lease. Landlord argues that rent reduction supports an inference Tenant agreed to replace the roofs (and make other improvements) in exchange for the rent reduction. Landlord cites Lin's testimony, in which he stated Tenant told him the roof was leaking and Tenant's rent was reduced accordingly pursuant to the Amendment. Lin testified that Tenant told him it "would take care of the problems there the City [of La Mesa] was asking [*sic*] and the roof leaking . . . ." Landlord also cites Parra's testimony that the roofs' life expectancies were 12 to 15 years, yet the roofs were about 25 years old.[7]

Noting Tenant entered possession of the Premises in 1993 (about the time the roofs' life expectancies expired), Landlord argues Tenant, in assuming obligations in the Lease in 1997 and Amendment in 2000 to *maintain* the roofs, necessarily must be obligated to *replace* them because at those points in time they presumably were unmaintainable. However, Landlord does not cite any testimony necessarily showing the roofs were unmaintainable in 1997 or

---

[6] Based on the judgment and the supplemental findings and statement of decision, it is unclear whether the trial court actually found language in the Lease or Amendment to be reasonably susceptible to more than one meaning. However, one statement in its supplemental findings and statement of decision supports an inference it did: "*The language of the* [*Amendment*] *is less than clear* and must be construed against the drafter—[Landlord]." (Italics added.)

[7] Landlord does not dispute the trial court's finding the roofs were installed in 1978 and had 15-year life expectancies that ended in 1993. However, Landlord complains the court did not note Tenant originally entered possession of the Premises in 1993, instead referring only to the commencement of the Lease in 1997. Given the fact that the roofs' life expectancies ended in 1993, the purported disparity in Tenant's date of possession (i.e., 1993 versus 1997) does not have probative value in determining the issue in this case. It is undisputed the roofs were dilapidated whenever Tenant took possession of the Premises.

2000. Furthermore, although Parra and apparently one or more roofing contractors concluded the roofs needed to be replaced, those opinions do *not* show Tenant's maintenance obligation necessarily includes a duty to replace the roofs.

In response to Landlord's argument Tenant was contractually obligated to replace the roofs, Tenant cites extrinsic evidence supporting a finding it had no such obligation, including other testimony by Lin (Landlord's predecessor-in-interest). Lin testified that in negotiating the Amendment he and Tenant never agreed Tenant would make improvements to or increase the value of the Premises. Also, he and Tenant did not discuss the need for the roofs to be replaced, but discussed only Tenant's obligation to maintain and repair the roofs. Tenant also cites testimony of Pour (apparently Tenant's president and/or owner), in which he stated that at the time he negotiated the Amendment (and presumably the Lease), he never thought Tenant would be expected to install a roof, but only to maintain the roofs. Pour testified that Tenant had maintained the roofs over the term of the Lease and had receipts showing completed roof repair work. Furthermore, prior to execution of the Lease, although one roofing contractor told him a new roof was required, Tenant hired another contractor who repaired the roof. When Pour was asked whether he understood at the time of negotiating the Amendment Tenant would be required to improve the Premises, he answered, "Absolutely not."

The primary purpose of the Amendment was to provide for Tenant's correction (in exchange for the rent reduction) of various code violations in the Premises found by the City of La Mesa (e.g., electrical, fencing, disability regulation compliance, etc.). As the trial court found, "[f]rom the [A]mendment the court gathers that there were some issues with the City of La Mesa, some code violations that were likely cited and that the [L]andlord was concerned that the [T]enant should take care of those issues and that an Amendment was crafted and signed." The court further found: "The bargained-for exchange between the parties was that [Tenant] brought the [Premises] into compliance with the City of La Mesa's codes and expended $30,000—$50,000 maintaining the leasehold." Landlord apparently does not challenge that aspect of the trial court's findings.[8]

Considering the extrinsic evidence in this case, Tenant's duty of maintenance under the Lease and Amendment can *only* be reasonably construed as

---

[8] Contrary to Landlord's argument, it is a mere coincidence the $40,000 rent reduction negotiated by Landlord and Tenant in 2000 for Tenant's correction of various code violations was approximately the same amount (i.e., $39,485) as the total of Parra's 2003 estimate of the cost of repairs needed for the Premises. Landlord does not show Parra's recommended repairs in 2003 were the same (or substantially the same) as the work required to correct the code violations previously found by the City of La Mesa in 2000 (which the trial court found Tenant had completed).

requiring Tenant to maintain the roofs in their conditions as of the time those written agreements were executed in 1997 and 2000 (i.e., in their then-dilapidated conditions). Had the parties intended Tenant to assume the obligation to *replace* the roofs, one would reasonably expect the Lease and/or Amendment to *expressly* so state rather than merely stating Tenant was required to *maintain* the roofs (and other parts of the Premises).

■ Case law supports a conclusion that, absent an express provision (or undisputed extrinsic evidence) showing a tenant has an obligation to replace a roof, a tenant's obligation to maintain or repair the premises (including a roof) does *not* include an obligation to replace an old, dilapidated roof with a new roof at tenant's expense. In *Iverson v. Spang Industries, Inc.* (1975) 45 Cal.App.3d 303 [119 Cal.Rptr. 399], a lease required the tenant to leave the premises in good order, condition and repair except for reasonable use and wear. (*Id.* at p. 310.) *Iverson* stated: "Such covenants are generally reasonably interpreted to avoid placing any unwarranted burden of improvement on the [tenant]. [Citation.] . . . '. . . The tenant is certainly not obligated to restore the premises to his landlord in a better condition than they were at the inception of the tenancy. [Citations.] . . .' [Citation.]" (*Iverson, supra,* 45 Cal.App.3d at p. 310; see also *Kanner v. Globe Bottling Co.* (1969) 273 Cal.App.2d 559, 565–566 [78 Cal.Rptr. 25].) In *Haupt v. La Brea Heating etc. Co.* (1955) 133 Cal.App.2d Supp. 784 [284 P.2d 985], a lease required the tenant to " 'make whatever repairs are necessary to the floor' and 'to repair the floor to a usable state.' " (*Id.* at p. Supp. 788.) *Haupt* concluded neither the lease nor statutory provisions (i.e., §§ 1928, 1929) obligated the tenant to restore the premises to a better condition than existed at the inception of the lease. (*Haupt, supra,* at pp. Supp. 788–789.) *Haupt* stated: "*If, at the time of the letting, the roof was old and worn, certainly [the tenant was] not required to repair the same and should not be held liable for the cost of a new roof* nor for damages occasioned by rainwater finding its way into the premises. [Citation.]" (*Haupt, supra,* 133 Cal.App.2d at p. Supp. 789, italics added.)

Likewise, in *Lynn v. DePue Warehouse Co.* (1962) 198 Cal.App.2d 742 [17 Cal.Rptr. 841], the court stated:

■ "Modern cases show reluctance to place too literal an interpretation on the [tenant's] covenant to repair. 'The covenant will be reasonably interpreted to avoid placing any unwarranted burden of improvement of the [landlord's] premises on the [tenant].' [Citation.]

". . . '[The tenant] is not . . . bound to make repairs of a substantial nature, involving the substitution of new structures, or parts thereof, for old, though these latter be defective and worn out through age.' " (*Lynn v. De Pue Warehouse Co., supra,* 198 Cal.App.2d at p. 746.)

In *American Trust Co. v. Truck Ins. Exch.* (1957) 147 Cal.App.2d 395 [305 P.2d 73], a lease provided the tenant was required to maintain the premises (including the sidewalk) in good order and repair. (*Id.* at p. 397.) In that case, the court stated: "It is thus clear that all that the [tenant] was required to do under the lease was to 'maintain' the sidewalk [involved in a personal injury action]. To *maintain* means to repair or keep in good condition things that *exist*, and not the creation of something new. [Citations.] There is nothing to indicate that the sidewalk was in any different condition on [the date of the accident] than it was at the time of entry by the [tenant]." (*Ibid.*; see also *Whalen v. Ruiz* (1953) 40 Cal.2d 294, 300 [253 P.2d 457] ["The word 'repair' in its ordinary sense relates to preservation of property in its original condition, and does not carry the connotation that a new thing should be made . . . ."].)

Those California cases are consistent with cases from other jurisdictions. (See, e.g., *Calderon v. Johnson* (La.Ct.App. 1984) 453 So.2d 615, 618 [" 'Simple maintenance' does not include the replacement of a system worn out because of age."]; *Chow Tim v. Lopez* (1953) 40 Haw. 55, 62 ["A covenant to keep the leased premises in repair does not obligate the tenant to keep the building up as new buildings; the extent of the repairs he is obliged to make necessarily depends upon the age and the class of the buildings. He need not give the [landlord] the benefit of a new replacement."]; *Scott v. Prazma* (Wyo. 1976) 555 P.2d 571, 576–579.) In *Scott*, which involved a 10-year lease that commenced in 1972 and required the tenant to keep the premises in good repair and condition as they then were, the Wyoming Supreme Court stated: "The lease in this case had about seven and a half years to run at the time [the tenant] quit the premises. This is a relatively short time to justify the extensive repairs by the [tenant], the greater benefit of which would revert to the [landlord], and which are obviously inequitable and not within the contemplation of the parties. The [landlord] is not entitled to a remodeled building. The building had been constructed in 1939 or 1940 and as nearly as can be determined from the record, the roof and roof structure are the original, as are the eaves, rain gutters, window frames and windows, other than glass replaced. It appears that the listed original items would have a life of somewhere around 30-35 years. [¶] . . . [¶]

". . . We cannot believe that the parties ever intended at the time of the execution of the lease here that the [tenant] would be burdened with an immediate $60,000.00 obligation for a roof and related structure by himself, let alone the other items, to substantially restore the [landlord's] building . . . .

". . . [Landlord's] position is obviously unfair because it would give [landlord] a better, fully reconstructed building than he leased, the life of which improvements would extend far beyond the [tenant's] remaining term

of less than eight years. It would become far superior to its condition at the date of the lease. By the express terms of the agreement, [the tenant's] obligation was only to keep it in its lease-date condition. It had taken over 30 years for the building to reach its present dilapidated state. . . . [¶] . . . [¶]

"*An ordinary covenant to keep the premises in good repair does not include the restoration of a part of a building which has become so run-down that it cannot be repaired.* [Citation.]" (*Scott v. Prazma, supra,* 555 P.2d at pp. 576–579, italics added, fn. omitted.)

 We conclude that although there is evidence supporting a finding both Landlord and Tenant knew, when the Lease and Amendment were executed in 1997 and 2000, the roofs needed to be replaced, that knowledge does *not* support a reasonable inference they intended, absent express language in the Lease or the Amendment, Tenant be required to *replace* the already dilapidated roofs. Although Landlord apparently assumes the Amendment allowed it to require Tenant to make certain improvements to the Premises (e.g., replacement of the roofs), Landlord does not show the language of the Amendment is reasonably susceptible to that interpretation. Furthermore, the extrinsic evidence cited by Landlord, discussed *ante*, does not support that interpretation. On the face of the Amendment, Tenant's primary obligations to maintain the Premises are set forth in the language of paragraph C of the Amendment, which deleted former paragraph 4 of the Lease and replaced it with the language quoted *ante*. The Amendment to the Lease added certain language to paragraph 3 of the Lease regarding Tenant's use of the Premises and included the word "improvement." The *only* reasonable construction of that word in the context of the entire Amendment is that it refers to Tenant's other obligations, as expressly stated in the Amendment, to maintain the Premises and correct various code violations found by the City of La Mesa. Landlord does *not* show that in 2000 the City of La Mesa required *replacement*, in contrast to repair, of the roofs. Furthermore, the word "improvement" in paragraph B of the Amendment is part of a sentence regarding the period in which Tenant must cure a default after Landlord's notice to the Tenant. Accordingly, the word "improvement," in that context, does not create an independent obligation for Tenant, but rather refers to Tenant's obligations to maintain the Premises and cure any code violations found by the City of La Mesa, expressly set forth in the Amendment. Based on the language of the Lease and Amendment and the extrinsic evidence discussed *ante*, we conclude the word "improvement" in the Amendment is *not*, as a matter or law, reasonably susceptible to an interpretation that Tenant was required to *replace* the roofs. Accordingly, we conclude, as a matter of law, Tenant was *not* required to *replace* the roofs of the Premises pursuant to either the Lease or the Amendment. Therefore, we reject Landlord's assertion Tenant breached the Lease and Amendment by not replacing the roofs.

C

Assuming arguendo the extrinsic evidence was conflicting and would have reasonably supported different interpretations of the Lease and Amendment regarding Tenant's purported obligation to replace the roofs, we nevertheless would conclude there is substantial evidence to support the trial court's finding in favor of Tenant's interpretation of those agreements. The trial court could reasonably infer the parties knew, when the Lease and Amendment were executed in 1997 and 2000, the roofs were dilapidated. The court could also infer, from the parties' omission of any express language requiring Tenant to replace—in contrast to merely maintain or repair—those roofs, no mutual intent to impose a replacement obligation on Tenant. Applying the substantial evidence standard of review, we conclude there is substantial evidence to support the trial court's finding Tenant did not have an obligation to replace the roofs under either the Lease or the Amendment. (*Howard v. Owens Corning, supra,* 72 Cal.App.4th at pp. 630–631.)

III

*Remaining Contention*

Landlord also contends the trial court erred by allowing Tenant to rely on affirmative defenses it did not properly plead in its answer to Landlord's unlawful detainer complaint (i.e., the defenses of impossibility and unenforceability).[9] However, to the extent the court allowed Tenant to assert or rely on those purported affirmative defenses, that error is harmless because the court did not rely on those defenses in reaching its decision and, in any event, we would affirm the judgment on the grounds set forth in part II.B., *ante.*[10] (*Davey v. Southern Pacific Co., supra,* 116 Cal. at p. 329.)

---

[9] Because we affirm the judgment on the grounds set forth in part II, *ante,* we need not address *Tenant's* assertion that Landlord's appeal is moot.

[10] In any event, we are not persuaded by Landlord's interpretation of the trial court's judgment and statement of decision. Although the court found the roofs could not be repaired because they were already beyond their life expectancies in 1997 and therefore required replacement, in so doing the court was not relying on the defense of impossibility or unenforceability regarding Tenant's contractual obligation to maintain the roofs. Rather, it was merely concluding neither the Lease nor the Amendment required Tenant to replace the roofs in the circumstances of this case. Likewise, we are not persuaded by Landlord's interpretation of a sentence in the trial court's findings of facts and statement of decision, in which the court stated: "The Court does *not* find that the [L]ease and [the Amendment] required [Tenant] to improve or modify anything and everything the Landlord requested." (Italics added.) That statement does *not* show the trial court misconstrued Landlord's argument at trial to be that, under the Lease and Amendment, Tenant was required to make *any and all* improvements to the Premises as Landlord requested.

## DISPOSITION

The judgment is affirmed. Tenant is entitled to costs on appeal.

McConnell, P. J., and Haller, J., concurred.