Filed 6/30/16  Radioshack Corp. v. Azusa Pacific University CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| RADIOSHACK CORPORATION,<br><br>　　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>AZUSA PACIFIC UNIVERSITY,<br><br>　　　　Defendant and Appellant. | B262107<br><br>(Los Angeles County<br>Super. Ct. No. KC 066135) |

　　　　APPEAL from a judgment of the Superior Court of Los Angeles County, Robert Dukes, Judge.  Reversed and remanded.

　　　　Manatt Phelps & Phillip, David Elson and Benjamin G. Shatz for Defendant and Appellant.

　　　　Booth Mitchel & Strange, Daniel M. Crowley and Christopher C. Lewi for Plaintiff and Respondent.

＿＿＿＿＿＿＿＿＿＿＿＿＿＿

## INTRODUCTION

Defendant and landlord Azusa Pacific University appeals the trial court's granting of summary judgment in favor of Plaintiff and tenant RadioShack, arguing that the court erroneously found Defendant breached its lease agreement with RadioShack. The sole issue on summary judgment was the interpretation of an excessive vacancy provision involving the replacement of a "Major Tenant" (an anchor tenant) with a "Similar Tenant." The court interpreted the lease agreement to allow RadioShack to pay reduced rent because the Similar Tenant did not sell the same goods as the Major Tenant. We reverse, concluding that RadioShack is not entitled to a reduction in rent. Under the plain language of the lease, a replacement tenant that sells the same quality of goods is a Similar Tenant. We conclude that Defendant did not breach the lease agreement by demanding payment of full rent. We reverse and remand for entry of judgment in Defendant's favor.

## FACTS AND PROCEDURAL BACKGROUND

In July 2000, RadioShack entered into a lease with Golden Mountain Investments, Inc. (Defendant's predecessor) for retail space in an Azusa shopping center containing a Big Lots. Defendant subsequently became the successor in interest to Golden Mountain Investments, Inc. and extended RadioShack's lease through January 2013.

The lease agreement, written by RadioShack, contained an excessive vacancy provision allowing the tenant to end the lease early or pay reduced rent when:

> "a Major Tenant, defined as any tenant that occupies more than fifteen percent (15%) of the Gross Leasable Area of the Shopping Center, as now or hereafter constituted, discontinues operations and a Similar Tenant, as defined below, does not replace it and open for business within a period of six (6) months. A 'Similar Tenant' is a tenant which occupies all of the leasable area of the space previously occupied by the Major Tenant that has discontinued operations and which *has the same or higher quality of goods to be sold* and equal or better customer traffic." (Italics added.)

In 2011, Big Lots, a Major Tenant, vacated the premises, and RadioShack began paying reduced rent later that year. In September 2012, Triad Fitness, a fully equipped work-out facility that provides physical fitness instruction and sells ancillary items, moved into and occupied all of Big Lot's leasable area. Defendant asked RadioShack to return to paying Fixed Minimum Rent because the excessive vacancy had been filled. RadioShack asserted that Triad Fitness did not fulfill the Similar Tenant definition, but resumed paying Fixed Minimum Rent under protest. In October 2012, RadioShack exercised the first of two 5-year options, extending the term of its lease until January 2018.

Shortly thereafter, RadioShack sued Defendant for breach of contract and declaratory relief, asserting that Triad Fitness was not a Similar Tenant. RadioShack then moved for summary judgment, arguing that Triad Fitness did not sell the same goods as Big Lots and thus an excessive vacancy continued to exist at the shopping center. RadioShack stipulated that RadioShack sales were not adversely impacted by the new tenant, that Triad Fitness occupied all of Big Lot's leasable area, and that Triad Fitness had customer traffic equal to Big Lots. RadioShack also did "not contend that the limited types of goods sold by Triad Fitness . . . [were] of a lessor quality than the comparable goods sold by Big Lots." Defendant opposed RadioShack's motion and brought its own motion for summary judgment, asserting that Triad Fitness was a Similar Tenant because it sold water bottles, t-shirts, and energy bars of the same quality as the products sold by Big Lots.

The court granted RadioShack's motion for summary judgment and denied Defendant's motion, finding that Triad Fitness was not a Similar Tenant. The court held: "When RadioShack contracted the Lease, it bargained for a specific clientele, due in part to the nature of the Major Tenant that occupied the premises at that time, i.e. Big Lots. The Lease specifically provided that if the Major Tenant were to vacate the premises, Lessor would rent the space to 'Similar Tenants' who sell the 'same' goods as the Major Tenant." The court granted judgment in favor of RadioShack and awarded RadioShack

$162,802.05 in damages for overpayment of rent, $15,056.77 in interest, and $32,036.21 in attorney's fees and costs. Defendant appeals.

## DISCUSSION

The sole issue on appeal is the interpretation of the lease's "Similar Tenant" definition. As it is undisputed that Triad Fitness satisfied the space and foot traffic characteristics of the Similar Tenant, we only address the meaning of the clause: "has the same or higher quality of goods to be sold." We review this issue of law de novo. (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266 ["We generally apply an independent, or de novo, standard of review to conclusions of law regarding interpretation of the [l]ease."]; *Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 717 [We review the trial court's ruling on a motion for summary judgment de novo, considering all of the evidence in the moving and opposing papers.].)

**1.     The Court Erred in its Interpretation of "Same or Higher Quality of Goods"**

The general rules of contract interpretation govern our construction of the lease agreement. (*Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1521.) "The language of a contract is to govern its interpretation if the language is clear and explicit, and does not involve an absurdity." (Civ. Code,[1] § 1638.) "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone." (§ 1639.) We therefore look to the language of specific provisions in the lease to ascertain the " 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense.' " (*ASP Properties Group, L.P. v. Fard, Inc., supra,* 133 Cal.App.4th at p. 1269.) "Interpretation of a contract 'must be fair and reasonable, not leading to absurd conclusions. [Citation.]' " (*Ibid.*) When the rules of interpretation do not resolve an ambiguity or uncertainty, "the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist." (§ 1654.)

---

[1]     All subsequent statutory references are to the Civil Code.

At issue here is how to interpret the adjective clause describing a "Similar Tenant" as one "which has the same or higher quality of goods to be sold." The insertion of the conjunction "or" between the adjectives "same" and "higher" in an adjective clause signals that "same" and "higher" function as equal and alternative modifiers of the noun that immediately follows, in this case the noun "quality."[2] (See Garner, The Chicago Guide to Grammar, Punctuation, and Usage (2016) pp. 187, 403; The Chicago Manual of Style (15th ed. 2003) p. 170.) Therefore, applying the rules of grammar to the plain language of the agreement, a Similar Tenant "which has the same or higher quality of goods" is a business selling goods of a specified degree of excellence–of the *same quality* or of higher quality than those sold by Big Lots.

RadioShack argues that the mutual intention of the parties was to require the Similar Tenant to be a retailer selling "some reasonable combination or variation of furniture, appliances, clothing, electronics, packaged food items, sundries, garden supplies, linens, cookware, auto supplies, home furnishings, seasonal merchandise, and other consumer items as did Big Lots." According to RadioShack, a fitness center that incidentally sells items such as water, snacks, and T-shirts is not a retailer selling the same type of goods. The problem is that, in drafting the lease, RadioShack did not use the term "retail" to define Similar Tenant even though it used this term elsewhere in the lease.

RadioShack's assertion that reading the lease as a whole supports its interpretation does not hold up under scrutiny. The adjective "retail" is defined as "relating to the business of selling things directly to customers for their own use." (Merriam–Webster's Online Dictionary (2016) <http:// www.merriam-webster.com/dictionary/retail> [as of

---

[2]     As used in the lease, "quality" means "a degree of excellence," in other words, "how good or bad something is." (Merriam-Webster's Online Dictionary (2016) <http://www.merriam-webster.com/dictionary/quality>[as of June 23, 2016].) Although "quality" can also mean a "peculiar and essential character" (*ibid*.), that definition is incompatible with the clause because the modifier "higher" indicates that "quality" encompasses degrees of value.

5

June 23, 2016]).)  Although the lease uses the term "retail" to first define "Excessive Vacancy" as when "(i) the Gross Leasable Area of the Shopping Center . . . is less than seventy percent (70%) actively occupied by other *retail* tenants" (italics added), the provision defining "Excessive Vacancy" arising out of the loss of a Major Tenant, does not use the term "retail."  Instead, the lease delineates "Excessive Vacancy" as the failure to replace "*any* tenant" that occupies 70% or more of the gross leasable area with a "Similar Tenant," "which has the same or higher *quality* of goods to be sold."  Having omitted the term "retail" from this provision, it must be presumed that the parties intentionally refrained from limiting Major Tenants and Similar (replacement) Tenants to retail businesses, leaving room for a successor Major Tenant operating a large restaurant, theater, fitness center or other service generating comparable customer traffic so long as its goods sold were of comparable quality.

RadioShack's election to specify types of goods elsewhere in the lease is further evidence that its focus on the Similar Tenant's quality of goods, rather than types of goods, was intentional.  Under the heading "PRODUCT EXCLUSIVITY," the Landlord promised not to accept a tenant selling specified goods in competition with RadioShack, agreeing that "no space within the Shopping Center, other than the Demised Premises . . . shall be used for (i) the retail sale or display of electronic equipment and components including . . . all types of telecommunication and transmitting equipment, computers and related accessories, [etc.]"  Although Radio Shack argues that the language of the lease required a Similar Tenant to sell "the same goods as did Big Lots, namely, furniture, appliances, clothing, electronics, snack items, sundries, garden supplies, linens, cookware, auto supplies, home furnishings, seasonal merchandise such as Christmas trees and decorations, and other consumer items," this interpretation is not reasonable because the lease does not identify these goods and refers, instead, to the quality of the Similar Tenant's products.

RadioShack's urged interpretation is also unreasonable because the parties stipulated that Big Lots sold "closeout merchandise that results from production overruns, packaging changes, discontinuation of products, liquidations, and returns."  As such, the

Big Lots merchandise available at any given time depended on the serendipity of other manufacturers' or retailers' overruns, discontinuations, liquidations or returns.  Although the parties further stipulated that, as a tenant in the shopping center Big Lots sold a wide variety of merchandise including "furniture, appliances, clothing, electronics, packaged food items, sundries, garden supplies, linens, cookware, auto supplies, home furnishings, seasonal merchandise, and other consumer items," there was no stipulation that Big Lots always had items in each category and no stipulation as to the proportion of merchandise in each category.  Without further definition, the requirement that a successor tenant sell the "same goods" as Big Lots would be fatally uncertain because Big Lots' inventory necessarily fluctuated depending on the market for other entities' closeouts.

As authority for its position, RadioShack cites an unpublished federal district court decision out of Oregon involving a lease agreement between a retailer, Old Navy and a shopping mall landlord.  (*Old Navy, LLC v. Ctr. Devs. Oreg, LLC* (D. Or. June 13, 2012, No. 3:11-472-KI) 2012 U.S. Dist. LEXIS 82579 (*Old Navy*).)  That case is distinguishable because the language in the lease is entirely different.  Unlike the lease agreement in the present case, the *Old Navy* lease required "the use" of the "Key Store" retail space by the "substitute retailer" to be "substantially the same as that conducted by the Key Store it is intended to replace."  (*Id*. at p. *3, boldface and underscoring omitted.)  Based on this language, the *Old Navy* court found that the substitute retailer (a grocery store) did not use the space in substantially the same way as the departing Key Store (Ross, a clothing retailer).  (*Id*. at p. *14.)  RadioShack's reliance on *Old Navy* is misplaced because the *Old Navy* lease expressly required a similar *use* of the premises by the replacement tenant.  In contrast, the RadioShack lease does not contain requirements regarding *use* by the Similar Tenant and instead imposes spacial, foot traffic, and quality of goods requirements on the Similar Tenant.

We therefore conclude that the RadioShack lease defined a Similar Tenant as selling goods of the same quality or of higher quality than Big Lots.

7

**2.      Defendant Did Not Breach the Lease Agreement**

It is undisputed that Triad Fitness sold water bottles, t-shirts, and energy bars that were of the same quality of goods sold by Big Lots.  Triad Fitness also satisfied the space and foot traffic requirements for a Similar Tenant.  Therefore, Triad Fitness was a Similar Tenant pursuant to RadioShack's lease agreement, and Defendant did not breach the lease agreement when it required RadioShack to resume paying full rent.  The court erred in granting RadioShack's summary judgment motion and denying Defendant's motion for summary judgment.

**DISPOSITION**

We reverse the judgment.  We remand for the trial court to grant Defendant's motion for summary judgment and to enter judgment in favor of Defendant.  Defendant Azusa Pacific University is awarded costs on appeal.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

HOGUE, J.[*]

I concur:



EDMON, P. J.




LAVIN, J.

---

[*]      Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.