Filed 3/12/15  Wells Fargo Bank v. Jackson Jenkins Renstrom CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| WELLS FARGO BANK, N.A.,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JACKSON JENKINS RENSTROM LLP,<br><br>Defendants and Appellants. | A138307<br><br>(City and County of San Francisco<br>Super. Ct. No. CGC 11-511389) |

Prior to filing for dissolution, a law firm with secured debt obligations assigned various client accounts to a newly-formed entity and simultaneously entered into an agreement allocating fees between the two firms.  The secured creditor sued the new law firm for, among other things, conversion, common count, and breach of contract under a third party beneficiary theory.  By special verdict, a jury found in favor of the secured creditor and awarded damages in the amount of $229,690.42.  We affirm.

## I. BACKGROUND

### A.    *The Secured Transactions*

#### 1.    *The Security Agreement*

In 2005, Jackson & Wallace, LLP, (J&W) a now defunct law firm, granted a security interest to Wells Fargo, N.A. (Bank or Wells Fargo) (Security Agreement).  Pursuant to the Security Agreement, J&W transferred to Bank a security interest "in all accounts, deposit accounts, chattel paper . . . promissory notes, documents, general intangibles, payment intangibles . . . and other rights to payment (collectively called 'Collateral'), now existing or any time hereafter, and prior to the termination hereof,

arising (whether they arise from the sale, lease or other disposition of inventory or from performance of contracts for service, . . . or otherwise or from any other source whatsoever), including all securities, guaranties, warranties, indemnity agreements, . . . and other agreements pertaining to the same or the property described therein, . . . together with whatever is receivable or received when any of the Collateral or proceeds thereof are sold, collected, exchanged or otherwise disposed of, whether such disposition is voluntary or involuntary . . . . (hereinafter called 'Proceeds')."

Pursuant to paragraph 6.2 of the Security Agreement, J&W agreed "not to sell . . . or otherwise dispose of, nor permit the transfer by operation of law of, any of Collateral or Proceeds or any interest therein." J&W also agreed, "if requested by Bank, to receive and use reasonable diligence to collect Proceeds, in trust and as the property of Bank, and to immediately endorse as appropriate and deliver such Proceeds to Bank . . . ."

Pursuant to paragraph 10 of the Security Agreement, in the event of default by J&W, the Bank, as a secured party under the California Uniform Commercial Code or otherwise provided by law, was entitled to immediate payment, as well as the right "to contact all persons obligated to [J&W] on any Collateral or Proceeds and to instruct such persons to deliver all Collateral and/or Proceeds directly to Bank . . . ." During any period of default, J&W agreed, among other things, "not [to] dispose of any Collateral or Proceeds except on terms approved by Bank."

*2.      The Credit Agreement*

In 2008, Bank extended a $7 million line of credit to J&W (Credit Agreement). Pursuant to section 1.4 of the Credit Agreement, J&W granted Bank "security interests of first priority in all [J&W's] accounts receivable and other rights to payment, general intangible." This section further sets forth that all such collateral "shall be evidenced by and subject to the terms of such security agreements, financing statements, . . . and other documents as Bank shall reasonably require . . . ."

Under section 6.2 of the Credit Agreement, upon default by J&W, "Bank shall have all rights, powers and remedies available under each of the Loan Documents, or accorded by law, including without limitation the right to resort to any or all security for

2

any credit subject hereto and to exercise any or all of the rights of a beneficiary or secured party pursuant to applicable law."

**B.** **Default, Dissolution, and Bankruptcy of J&W**

In 2010, J&W defaulted on the Credit Agreement with Bank and subsequently filed for bankruptcy. Also in 2010, two of the partners of J&W created a new law firm.

*1.* *Assignment of Retention Agreement*

On January 15, 2009, Fireman's Fund Insurance Company (FFIC) retained J&W to work on various matters (Retention Agreement). On or about May 13, 2010, just prior to its dissolution, J&W assigned a portfolio of accounts, including approximately 150 to 200 FFIC cases to the newly created law firm of Jackson Jenkins Renstrom LLP (JJR), the latest iteration of co-founding J&W partner Gabriel Jackson and her fellow J&W partner and husband, Peter Renstrom. Pursuant to the Assignment of Retention Agreement (Assignment), the Retention Agreement between J&W and FFIC was assigned from J&W to JJR. The Assignment noted that FFIC had previously advised J&W that it would be terminating the Retention Agreement, but nevertheless requested continued legal representation by J&W in certain ongoing "Runoff Matters" and that the Retention Agreement be assigned to JJR. J&W agreed to maintain tail insurance for professional errors for a period of three years following the effective date of the Assignment.

*2.* *Side Agreement*

On or about May 13, 2010, J&W also entered into a Side Agreement with JJR, Jackson individually, together with J&W co-founder John Wallace and his new law firm. The Side Agreement provides, among other things, that Jackson and Wallace, as the equity partners of J&W, were "attempting to resolve a number of outstanding issues relating to the dissolution of [J&W], the collection of assets and the payment of liabilities of [J&W], and the future representation of clients of [J&W].") Under the terms of the Side Agreement, FFIC was to pay certain flat fees or accelerated settlement payments regarding the Runoff Matters. To the extent any of the Runoff Matters settled or were otherwise resolved after the dissolution date, FFIC was to make payments directly to JJR,

which would then pay J&W its allocated share based upon an agreed formula. J&W agreed to obtain tail insurance for professional liability and general liability coverage for at least three years following the dissolution date.

## C. Commencement of Litigation

Pursuant to the Assignment and Side Agreement, FFIC made payments directly to JJR. JJR accepted the payments, but did not remit the agreed-upon allocable share to J&W.

On April 22, 2011, having only recently learned of the Side Agreement, Wells Fargo sent a letter to JJR, asserting its right as a secured creditor to monies owed to J&W thereunder. Approximately a month later, JJR responded by letter dated May 31, 2011. In this letter, counsel for JJR advised Wells Fargo that "JJR intends to pay whatever monies it owes to J&W/Wells Fargo pursuant to [the Side Agreement]." As of the date of the letter, the amount due was $147,999.53. Counsel further advised that JJR was in the process of creating additional documentation for the remaining amounts owed.

As of October 3, 2011, JJR had not yet paid Wells Fargo any of the monies due or provided the additional documentation. On that date, Wells Fargo filed its First Amended Complaint against JJR for the money owed by JJR to J&W and Wells Fargo, as the first priority secured creditor with the right to collect all of J&W's accounts receivable. Nearly four months later, on February 16, 2012, JJR served supplemental discovery responses and produced detailed spreadsheets documenting the full amount owed to J&W, to wit: $229,690.42. Despite the May 31, 2011 letter, promising to pay Wells Fargo, and the subsequent spreadsheet evidencing the exact amount of $229,690.42 owed to Wells Fargo, JJR refused to pay Wells Fargo; instead, JJR sought to retain J&W's allocated share of the payments made from FFIC in 2010 and 2011.

Wells Fargo sought damages against JJR for conversion, common count, and breach of contract as a third party beneficiary. Wells Fargo also sought an accounting.

## D. Trial

In January 2013, the matter proceeded to jury trial. The parties agreed and stipulated to all of the jury instructions and the special verdict forms to be presented to

4

the jury. While reserving all defenses, JJR stipulated in writing before the court and the jury to the amount owed under the Side Agreement by JJR to J&W was the sum of $229,690.42.

        1.      *Wells Fargo's Case*

Gabriel Jackson and Peter Renstrom testified in Wells Fargo's case-in-chief as adverse witnesses. (See Evid. Code, § 776.)

Gabriel Jackson testified that she knew Wells Fargo had a security interest in the accounts and accounts receivable of J&W. She also knew that Wells Fargo was the only secured creditor of J&W. Jackson understood that pursuant to section 6.2 of the Credit Agreement, Wells Fargo had the rights of a beneficiary in the event of default by J&W. She acknowledged that Wells Fargo advanced a $7 million line of credit to J&W.

Jackson agreed that the Assignment and the Side Agreement were both integrated documents. She agreed that one of the purposes of the Side Agreement was to allow JJR to keep FFIC as a client. However, she disputed that another purpose of the Side Agreement was to set forth how payments from FFIC would be allocated between JJR and J&W. Jackson conceded that at the time of the signing of the Side Agreement, J&W had certain monetary obligations to Wells Fargo and that Wells Fargo, as a secured creditor, had a right to collect upon J&W's accounts receivable. Jackson also knew that at the time of J&W's dissolution, Wells Fargo was seeking to collect the money it was owed, which was in the millions.

Jackson admitted that she signed the Side Agreement in three capacities, one being individually, yet she denied that she was personally responsible for obtaining tail insurance. Before she signed the Side Agreement, she did not ask anyone about the impact of the tail insurance provision.

Peter Renstrom testified that he had been a partner at J&W and that he was a founding partner of JJR. He participated in negotiating the terms of the Assignment and the Side Agreement. He acknowledged that both documents represented integrated agreements. Renstrom was aware that at the time he signed the Side Agreement, Wells Fargo was one of J&W's largest secured creditors.

Renstrom testified that he was involved in drafting the tail insurance provision in the Side Agreement. When asked whether he recalled "ever considering any language in paragraph 4 that made the obtaining of tail insurance contingent on whether [J&W] would receive payments" under the Side Agreement, Renstrom replied, "I don't think so, because it was–," at which point the court interrupted before the witness could continue with his answer. The court interjected, "Just a second. [¶] That's an answer . . . . [¶] Yes or no is fully responsive in this context." Following this interchange, trial counsel for Wells Fargo, queried, "Let me ask the question a different way. [¶] As part of negotiations, did you ever consider including any language in paragraph 4 that made the payment of monies to [J&W] under the side agreement contingent on [J&W] obtaining tail insurance?" This time Renstrom answered in the affirmative. When counsel for Wells Fargo asked Renstrom if "[a]nywhere in that language, is there a contingency [,]" defense counsel objected on the grounds that the document spoke for itself. The court sustained the objection and added the following: "I think your answer that, as one of the parties involved in this side agreement or as the point person, you did consider inserting language—correct me if I'm wrong—that would have provided that monies to be paid to [J&W] . . . were contingent upon [J&W] getting tail insurance; however, ultimately, the document that was executed in the [*sic*] integrated agreement is what it is? [¶] Is that accurate or not?" Renstrom replied, "No, it is not."

Counsel for Wells Fargo then asked Renstrom, "So let me understand this. [¶] You did consider making the payment to [J&W] of monies owed under the side agreement, contingent on [J&W] obtaining tail insurance?" Renstrom replied, "It was understood, yes." The following interchange then occurred: "[THE COURT]: We're not asking about undisclosed intentions. [¶] He's asking what your intention was, as a drafter. [¶] THE WITNESS: It's kind of difficult for me, Your Honor, to answer these questions either yes or no. [¶] [THE COURT]: Well, I think they call for it . . . [¶] THE WITNESS: I'll try my best." After the question was read back, the court advised the witness, "You can answer that question." Renstrom apologized and asked for the question to be read back again. The court noted that the "question, if you believe it to be

a clear one and can be answered yes or no, without further response, please do so." After the question was read back a third time, but before Renstrom could answer, the court interjected: "Just think about it. [¶] If you can answer yes or no, can be straightforward, tell us. If you cannot, tell us." Renstrom replied, "I cannot."

### 2. *Defense Case*

Jackson testified that she brought FFIC in as a client to J&W. She characterized the dissolution of J&W as being "[v]ery bitter and very difficult." Following the dissolution of J&W, FFIC continued to be represented by Jackson through her new law firm, JJR. This continuity of representation was accomplished by the assignment of the FFIC cases from J&W to JJR. Jackson testified that tail insurance was never purchased. Following extensive argument outside of the jury's presence, the trial court ruled that Jackson would not be able to testify as to whether tail insurance was an important consideration. The court also ruled that Jackson could not present evidence regarding the cost of obtaining tail insurance.

Renstrom testified that he negotiated the Side Agreement. The subject of tail insurance was part of the negotiations. Renstrom, however, was not permitted to testify about the specifics of such negotiations and was precluded from describing what was offered in exchange for the procurement of the tail insurance. Renstrom testified that Wells Fargo was not mentioned "any place in" the Side Agreement.

### 3. *Verdict and Post-trial Motion*

By special verdict, the jury all-but-unanimously found in favor of Wells Fargo on its three claims against JJR—conversion, common counts, and breach of contract/third party beneficiary, each in the non-aggregated sum of $229,690.42—and awarded damages to Wells Fargo in the amount of $229,690.42. Thereafter, JJR moved for judgment notwithstanding the verdict, which was heard, argued and submitted for decision on March 5, 2013. That same day, the court issued an order denying JJR's motion as follows: "The motion is denied. The verdict in favor of WELLS FARGO BANK, N.A. on all causes of action, is well supported in law and in fact. The jury was

7

entitled to conclude the defendant [JJR] attempted to assert technical and insubstantial defenses in order to defeat clear obligations to plaintiff."

JJR filed a timely notice of appeal.

## II. DISCUSSION

### A. *Standards of Review*

The parties begin by making differing characterizations about the issues before the jury, which in turn affect the standard of review by which we evaluate the issues on appeal. JJR contends that the primary issue at trial was the legal question of the interpretation of the contract.[1] JJR claims that there is no conflicting extrinsic evidence and, as such, de novo review is appropriate. For its part, Wells Fargo contends the jury's findings that JJR challenges were factual determinations, rather than legal conclusions. We set forth the applicable legal principles that will guide us in resolving the claims of error that JJR presents on appeal.

With respect to the legal correctness of the judgment entered after the special verdict, the following basic approach is required on review. Under Code of Civil Procedure section 624, a special verdict is defined as one in which "the jury find the facts only, leaving the judgment to the Court. The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." A special verdict will be upheld if it is consistent with the law and the evidence. (See 7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 345, pp. 401-403.)

Here, the language of the special verdict tracked the jury instructions for determining whether JJR wrongfully exercised control over Wells Fargo property, whether JJR owed money to Wells Fargo, and whether JJR breached the Side Agreement by not paying J&W, and Wells Fargo as J&W's first-priority secured creditor, its allocable share. In making these determinations, the jury was required to determine from

---

[1] Our review of the stipulated jury instructions and special verdict indicates that the issues at trial extended well beyond the narrow legal issue raised on appeal by JJR.

8

the evidence whether Wells Fargo had "a right to possess the share" of the FFIC payments received by JJR and promised to J&W under the terms of the Side Agreement; whether JJR "intentionally and substantially" interfered with Wells Fargo's property "by refusing to return the money promised to [J&W] under the terms of the Side Agreement after Wells Fargo [] demanded its return"; whether Wells Fargo consented; whether Wells Fargo was harmed; and whether JJR was a substantial factor in causing Wells Fargo's harm.

The jury was next tasked with determining whether JJR owed money to Wells Fargo. The jury was required to determine whether JJR received money "that was intended to be used for the benefit" of Wells Fargo; whether the money JJR received was "used for the benefit" of Wells Fargo; and whether JJR gave the money to Wells Fargo.

Finally, the jury was instructed that Wells Fargo was not a party to the contract, but that it could be entitled to damages for breach of contract if it proved that the parties to the Side Agreement intended for Wells Fargo to benefit from their contract. The jury was further instructed that it was not necessary for Wells Fargo to have been named in the contract, and was told, "In deciding what the parties to the [Side Agreement] intended, you should consider the entire contract and the circumstances under which it was made." The jury was required to determine whether JJR breached the Side Agreement and harmed Wells Fargo. In making this determination, the jury was required to decide whether JJR and J&W entered into a contract; whether J&W "d[id] all, or substantially all, of the significant things that the contract required it to do"; whether "all the conditions that were required for [JJR's] performance occur[ed] or were they excused"; and whether JJR "fail[ed] to do something that the contract required it to do"; whether Wells Fargo was "an intended beneficiary of the contract" between J&W and JJR; and whether Wells Fargo was harmed.

We conclude that the issues raised in the trial court involved both legal and factual questions. The interpretation of a contract generally presents a question of law for our independent determination. (See *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865.) Nevertheless, when a

9

contract is reasonably susceptible to different interpretations based upon conflicting evidence requiring the resolution of credibility issues, its interpretation evolves into a question of fact that is governed by the substantial evidence test. (See *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888; *ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1270-1271 (*ASP Properties*).)

With these standards of review in mind, we turn to the merits of the appeal.

**B.    Evidentiary Issues**

Preliminarily, we address JJR's claim that the trial court erroneously excluded certain evidence at trial. According to JJR, the trial court erred by excluding evidence regarding the importance or materiality of the tail insurance provision and evidence of the cost of obtaining such insurance.

*1.    Background*

During defense counsel's examination of Renstrom, the trial court excluded evidence relating to what, if anything, JJR offered J&W in exchange for J&W's procurement of tail insurance. In so ruling, the court explained: "In light of the entire agreement which supersedes all prior discussions or understandings, and in light of the fact the satisfactory language was ultimately determined and signed off on . . . [t]he words in the negotiation are not relevant."

Defense counsel also attempted to ask Jackson whether it was "important to [her] in any way" that J&W have tail insurance; counsel for Wells Fargo objected and the court declared an early recess to discuss the matter further outside the presence of the jury. The court noted that in light of the fact that "everyone said they were integrated agreements[,] . . . we're not here to vary the obligations undertaken." The court then gave the parties a few moments to review the parol evidence rule. The court further advised defense counsel that it would "be helpful to get an offer so that I can give some kind of preliminary ruling on it, . . . so I'm in the background and not interrupting." Defense counsel then explained that in her last question about whether tail insurance was important to Jackson, she "was simply trying to establish whether or not it was, since one of the arguments has been, it was not a material provision, and it shouldn't be anything to

10

worry about, that it wasn't bought." Citing Civil Code section 1638, the court explained that "the language of a contract is to govern its interpretation. [¶] And I think the statement, it was important or not important, is really something that is offered as an interpretive comment . . . [¶] If the language is clear and explicit, it doesn't involve an absurdity, when the contract is reduced to writing, the intention of the parties is to be ascertained from the writing of alone . . . ." When defense counsel asserted that the challenged evidence was relevant to whether obtaining tail insurance was a material term of the contract, the court opined that this question is "largely to be determined from the integrated contract . . . ."

After hearing further argument about the significance of tail insurance, the court ruled that "the consequence of not getting it, or what would have happened, is very confusing and not directly relevant to any disputed fact or consequence in determining this action." The court added that the real issue "should be on the question of whether it's a condition precedent from the contracts."

The court also heard extensive argument on the admission of anticipated evidence pertaining to the cost of obtaining tail insurance. Counsel for Wells Fargo argued there was no foundation for Jackson to present evidence regarding the pricing of tail insurance. Defense counsel, however, maintained that Jackson, as the owner of the firm, personally spoke with a broker about the cost of obtaining such insurance. Counsel for Wells Fargo insisted any such evidence was hearsay. The trial court ruled as follows: "In this case . . . the questions related to the consequences to . . . either firm—based upon assumed malpractice would be X, the cost of obtaining a hypothetical policy of insurance coverage for Y is inadmissible on the following basis []: [¶] It assumes facts not in evidence. [¶] It calls for expert . . . testimony from people not designated as an expert [*sic*]. [¶] It is, under these facts, highly collateral to any claim or defense, so that under Evidence Code [s]ection 352, the line of questioning . . . would be very confusing . . ., depriving each side of an opportunity to have proper focus, direct and cross-examination. [¶] And it does not call for personal knowledge . . . [¶] And it does not call for admissible opinion

testimony from a layperson who can . . . offer opinion testimony on matters actually perceived."

2. *Applicable Law*

The parol evidence rule, which is codified in Code of Civil Procedure section 1856 and Civil Code section 1625, establishes that extrinsic evidence is not admissible to ascribe a meaning to an agreement to which it is not reasonably susceptible. (*Wells Fargo Bank v. Marshall* (1993) 20 Cal.App.4th 447, 453.) "It provides that when parties enter an integrated written agreement, extrinsic evidence may not be relied upon to alter or add to the terms of the writing. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343 (*Casa Herrera* ).) 'An integrated agreement is a writing or writings constituting a final expression of one or more terms of an agreement.' (Rest.2d Contracts, § 209, subd. (1); see *Alling v. Universal Manufacturing Corp.* (1992) 5 Cal.App.4th 1412, 1433.)" (*Riverisland Cold Storage, Inc. v. Fresno-Madera Production Credit Assn.* (2013) 55 Cal.4th 1169, 1174 (*Riverisland*), fn. omitted.) There is no dispute in this case that the Side Agreement was integrated.

"Although the parol evidence rule results in the exclusion of evidence, it is not a rule of evidence but one of substantive law. (*Casa Herrera, supra,* 32 Cal.4th at p. 343.) It is founded on the principle that when the parties put all the terms of their agreement in writing, the writing itself becomes the agreement. The written terms supersede statements made during the negotiations. Extrinsic evidence of the agreement's terms is thus *irrelevant,* and cannot be relied upon. (*Casa Herrera,* at p. 344.) '[T]he parol evidence rule, unlike the statute of frauds, does not merely serve an evidentiary purpose; it determines the enforceable and incontrovertible terms of an integrated written agreement.' (*Id.* at p. 345; cf. *Sterling v. Taylor* (2007) 40 Cal.4th 757, 766 [explaining evidentiary function of statute of frauds].) The purpose of the rule is to ensure that the parties' final understanding, deliberately expressed in writing, is not subject to change. (*Casa Herrera,* at p. 345.)" (*Riverisland, supra,* 55 Cal.4th at p. 1174.)

In this case extrinsic evidence on the parties' intended meaning of language in the Side Agreement was ultimately admissible *only* if it was relevant to show a meaning to

which that language is reasonably susceptible. (*Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) " 'The decision whether to admit parol [or extrinsic] evidence involves a two-step process. First, the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine "ambiguity," i.e., whether the language is "reasonably susceptible" to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is "reasonably susceptible" to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step-interpreting the contract. [Citation.]'

" 'Different standards of appellate review may be applicable to each of these two steps, depending upon the context in which an issue arises. The trial court's ruling on the threshold determination of 'ambiguity' (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. [Citation.] Thus the threshold determination of ambiguity is subject to independent review. [Citation.]'

" 'The second step—the ultimate construction placed upon the ambiguous language—may call for differing standards of review, depending upon the parol evidence used to construe the contract.' (*Winet v. Price, supra,* 4 Cal.App.4th at pp. 1165-1166.)" (*ASP Properties, supra,* 133 Cal. App. 4th at pp. 1266-1268, fn. omitted.)

*3.      Analysis*

JJR asserts that the trial court erred in failing to provisionally consider extrinsic evidence of the parties' intent regarding the importance of the tail insurance provision. We disagree.

Paragraph 4 of the Side Agreement provided as follows: "[Gabriel] Jackson and [John] Wallace agree that [J&W] shall obtain tail insurance for professional liability and general liability coverage for a period of not less than three years after the Dissolution Date, in an amount of $3 million per occurrence/$5 million aggregate." On its face, this provision in the Side Agreement is unambiguous. It clearly and explicitly stated that J&W was required to obtain tail insurance—nothing more, nothing less. There is nothing

13

in the plain language of the Side Agreement that would indicate that the parties intended for this provision to constitute a condition precedent to J&W receiving its allocable share. Thus, to the extent JJR sought to introduce evidence regarding the alleged materiality of this provision, any such evidence would have varied the terms of the Side Agreement and was squarely within the ambit of the parol evidence rule. As the trial court correctly concluded, the understanding of the parties during negotiations was simply not relevant.

Equally without relevance was the proffered evidence regarding the cost of obtaining tail insurance. Even assuming for the sake of argument that paragraph 4 of the Side Agreement was ambiguous (a position we flatly reject), we fail to discern how the evidence pertaining to the cost of the tail insurance was relevant to the interpretation urged by JJR. In other words, the procurement of tail insurance, whether it be economical or cost prohibitive, has no bearing on whether paragraph 4 could be construed as a material provision in the Side Agreement.

In sum, the language of the Side Agreement was clear and its plain terms control. Accordingly, the trial court did not err in failing to consider extrinsic evidence regarding the negotiation of the Side Agreement.

## C.     *Breach of Contract*

To establish a cause of action for breach of contract, the plaintiff must plead and prove (1) the existence of a contract, (2) the plaintiff's performance or excuse for nonperformance, (3) the defendant's breach, and (4) resulting damages to the plaintiff. (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821.)

The undisputed evidence demonstrates that J&W and JJR entered into a written agreement under which JJR agreed to allocate future payments from FFIC to J&W regarding J&W's work on certain Runoff Matters. J&W agreed to purchase tail insurance. FFIC made payments directly to JJR for work performed by J&W. It is undisputed that JJR received $229.690.42 from FFIC. The undisputed facts further show that JJR accepted payment from FFIC but failed to pay J&W its allocable share. It is also undisputed that J&W failed to procure tail insurance.

14

## 1.    *Third Party Beneficiary Status*

The salient query on appeal is whether Wells Fargo was entitled to recover for breach of contract despite not being a named party to the Side Agreement.  Under Civil Code section 1559, a third party can enforce the terms of a contract "made expressly for the benefit of [the] third person."  " 'Expressly' " in this context is interpreted to mean "merely the negative of 'incidentally.' " (*Gilbert Financial Corp. v. Steelform Contracting Co.* (1978) 82 Cal.App.3d 65, 70.)  The contract need not be exclusively for the benefit of the third party in order to permit enforcement, and the third party does not need to be the sole or the primary beneficiary.  Further, the third party need not be identified as a beneficiary, or even named, in the contract.  (*Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1232.)  " 'If the terms of the contract necessarily require the promisor to confer a benefit on a third person, then the contract, and hence the parties thereto, contemplate a benefit to the third person.  The parties are presumed to intend the consequences of a performance of the contract.' (*Johnson v. Holmes Tuttle Lincoln–Mercury, Inc.* (1958) 160 Cal.App.2d 290, 296-297.)"

On the other hand, " ' "[t]he fact that . . . the contract, if carried out to its terms, would inure to the third party's benefit is insufficient to entitle him or her to demand enforcement." ' " (*Landale–Cameron Court, Inc. v. Ahonen* (2007) 155 Cal.App.4th 1401, 1411.)  Rather, " ' " '[i]t must appear to have been the intention of *the parties* to secure to him personally the benefit of its provisions.' " ' " (*Prouty v. Gores Technology Group, supra,* 121 Cal.App.4th at p. 1233.)

To reflect the above distinctions, the law classifies beneficiaries as either an intended or incidental.  (*Prouty v. Gores Technology Group, supra,* 121 Cal.App.4th p. 1233.)  Intended beneficiaries are often further categorized as either creditor or donee beneficiaries.  (*Lake Almanor Associates L.P. v. Huffman–Broadway Group, Inc.* (2009) 178 Cal.App.4th 1194, 1199.)  Here, we are concerned only with creditor beneficiaries; there is no suggestion that secured creditor Wells Fargo was a donee beneficiary of J&W's Side Agreement with JJR.  " 'A creditor beneficiary is a party to whom a promisee owes a preexisting duty which the promisee intends to discharge by means of a

15

promisor's performance.' [Citations.]" (*Id.* at p. 1200.) A person cannot be a creditor beneficiary unless the promisor's performance of the contract will discharge some form of legal duty owed to the beneficiary by the promisee. (*Ibid.*)

" ' "Whether a third party is an intended beneficiary or merely an incidental beneficiary to the contract involves construction of the parties' intent, gleaned from reading the contract as a whole in light of the circumstances under which it was entered. [Citation.]" ' " (*Landale–Cameron Court, Inc. v. Ahonen, supra,* 155 Cal.App.4th at p. 1411.) Where, as here, the facts are undisputed, the issue is one of law. (*Prouty v. Gores Technology Group, supra,*121 Cal.App.4th at p. 1233.)

We conclude there was substantial evidence upon which the jury could find that Wells Fargo is a third party beneficiary of the Side Agreement for two interrelated reasons. First, Wells Fargo will necessarily benefit from the Side Agreement. As discussed above, one purpose of the Side Agreement is the "collection of assets and the payment of liabilities" of J&W. Another purpose of the Side Agreement is to resolve outstanding issues regarding the "future representation of clients" of J&W following its dissolution. To the extent JJR's performance of its contractual duties allocates payments to J&W for certain Runoff Matters performed by J&W for FFIC, it confers a benefit on Wells Fargo. This benefit is not incidental; rather, it flows directly from one of the stated purposes of the contracting parties, which was to resolve outstanding issues regarding "the collection of assets and the payment of liabilities" of J&W. Second, the undisputed facts demonstrate that Jackson, as a founding partner of both J&W and JJR, was fully aware that Wells Fargo was J&W's sole secured creditor and that J&W owed millions of dollars to Wells Fargo. With knowledge of this considerable, extant secured debt, Jackson signed the Side Agreement in her individual capacity, as a partner of J&W, and as a partner of JJR. The language of the Side Agreement clearly and explicitly references that JJR and J&W intended to resolve "a number of outstanding issues relating to the dissolution" of J&W, including, among other things, payment of J&W's liabilities. To be sure, a multi-million secured debt falls within the ambit of J&W's "liabilities" to be addressed by the Side Agreement. The intended goal of resolving J&W's "liabilities"

16

existing at the time of dissolution demonstrates the intent of the parties to benefit Wells Fargo. Accordingly, Wells Fargo qualifies as a third party beneficiary of the Side Agreement.

JJR argues that even if Wells Fargo could be considered a third party beneficiary of the Side Agreement, it was not entitled to recover due to J&W's failure to procure tail insurance. According to JJR, J&W's failure to obtain tail insurance constituted a material breach of the Side Agreement. In essence, JJR seeks to transform paragraph 4 of the Side Agreement into a condition precedent. Nothing, however, in the plain language of the Side Agreement supports such an interpretation. Likewise, nothing in the record supports JJR's position. Although Renstrom testified that he had considered including language in the Side Agreement that would have made the procurement of tail insurance a condition precedent, the jury clearly rejected JJR's theory at trial.

### 2. *Damages*

Finally, JJR, cites the rule that a third party beneficiary may not obtain greater recovery than that which would have been available under the contract (see *Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 894-895). JJR contends that even if Wells Fargo could be considered a third party beneficiary, it was not entitled to damages under the Side Agreement because the cost of obtaining the tail insurance was "far more" than the damages claimed by Wells Fargo. This argument is without merit. As discussed, the cost of obtaining tail insurance was simply not relevant in interpreting the Side Agreement and the trial court did not err in excluding such evidence. The damages claimed by Wells Fargo flow not from J&W's failure to obtain tail insurance, but from JJR's breach in failing to remit to J&W the agreed upon share of the FFIC proceeds. JJR's corollary argument that "J&W's breach" forced JJR to shoulder the risk of operating without proper liability insurance is similarly inapposite in determining the amount of Wells Fargo's recovery under the Side Agreement.

### D. *Common Count*

A common count is a simplified form of pleading normally used to aver the existence of various forms of monetary indebtedness. (*McBride v. Boughton* (2004) 123

17

Cal.App.4th 379, 394.) "The . . . essential [elements] of a common count are '(1) the statement of indebtedness in a certain sum, (2) the consideration, i.e., goods sold, work done, etc., and (3) nonpayment.' [Citation.]" (*Farmers Ins. Exchange v. Zerin* (1997) 53 Cal.App.4th 445, 460.) A common count is used as an alternative way of seeking the same recovery demanded in a specific cause of action, and is based on the same facts. (See *Farmers Ins. Exchange v. Zerin, supra,* 53 Cal.App.4th at pp. 459-460.) Thus, in the present case, Wells Fargo's common count must stand or fall with its breach of contract cause of action. Like Wells Fargo's claim for breach of contract, we are satisfied that the special verdict in favor of Wells Fargo on its common count cause of action was proper.

### E. Conversion

JJR next contends that Wells Fargo's conversion claim must fail because its rights are limited to those provided by the Side Agreement. According to JJR, Wells Fargo "is not allowed to bring" a tort cause of action, and even if it could, JJR "cannot be held liable for conversion because the subject of this action is money." Neither contention has merit.

" 'Conversion is the wrongful exercise of dominion over the property of another. The elements of a conversion claim are: (1) the plaintiff's ownership or right to possession of the property; (2) the defendant's conversion by a wrongful act or disposition of property rights; and (3) damages . . . . [Citations.]' " (*Los Angeles Federal Credit Union v. Madatyan* (2012) 209 Cal.App.4th 1383, 1387; see CACI 2100; *Gruber v. Pacific States Sav. & Loan Co.* (1939) 13 Cal.2d 144, 148 [conversion is the wrongful exercise of dominion "over another's personal property in denial of or inconsistent with his rights therein"]. (*Welco Electronics, Inc. v. Mora* (2014) 223 Cal.App.4th 202, 208 (*Welco*).)

In California, the tort of conversion has expanded well beyond its original parameters, which were limited to items of tangible personal property. (*Welco, supra,* 223 Cal.App.4th at pp. 209-210.) In determining whether property that has been taken is subject to a conversion claim, "courts have recognized that '[p]roperty is a broad concept

18

that includes "every intangible benefit and prerogative susceptible of possession or disposition." [Citation.]' [Citation.]" (*Id.* at p. 211.) "Generally, conversion has been held to apply to the taking of intangible property rights when '*represented by documents, such as bonds, notes, bills of exchange, stock certificates, and warehouse receipts.*' [Citation.] As one authority has written, 'courts have permitted a recovery for conversion of assets reflected in such documents as accounts showing amounts owed, life insurance policies, and other evidentiary documents. These cases are far removed from the paradigm case of physical conversion; they are essentially financial or economic tort cases, not physical interference cases.' (3 Dobbs, The Law of Torts (2d ed. 2011) § 710, p. 804, fn. omitted; see Prosser, Handbook of the Law of Torts (2d ed. 1955) 69–70 ['It is now held that there may be an action for conversion, not only of the intangible rights represented by special instruments which give control, such as a check, a bill of lading, a bank book, an insurance policy, or a stock certificate, but also of such rights alone, as in the case of the corporate stock apart from the certificate. There is perhaps no essential reason why there might not be a conversion of a debt, the good will of a business, or even an idea, or "any species of personal property which is the subject of private ownership;" but thus far there has been no particular need for any extension of the remedy beyond commercial securities']; but see Prosser & Keeton on Torts (5th ed. 1984) § 15, p. 92.)" (*Welco, supra,* 223 Cal.App.4th at pp. 209-210.)

Although a generic claim for money is not actionable, money may be the subject of conversion if the claim involves a specific, identifiable sum, such as " 'where an agent accepts a sum of money to be paid another and fails to make the payment. [Citation.]' " (*PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 395.) In California, actionable cases for conversion of money typically involve misappropriation, commingling, or misapplication of specific funds held for the benefit of others. (See, e.g., *Welco, supra,* 223 Cal.App.4th at pp. 211-212 [misappropriation of line of credit on credit card actionable]; *Los Angeles Federal Credit Union v. Madatyan, supra,* 209 Cal.App.4th at p. 1388 [credit union with lien on car prevailed where body shop cashed insurance proceeds]; *Plummer v. Day/Eisenberg, LLP*

(2010) 184 Cal.App.4th 38, 48 [attorney with contingent fee lien had actionable conversion claim]; *Fremont Indemnity Co. v. Fremont General Corp.* (2007) 148 Cal.App.4th 97, 125 [misappropriation of net operating losses actionable conversion]; *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 599-600, [attorney's lien on settlement proceeds of settlement subject to lien]; *McCafferty v. Gilbank* (1967) 249 Cal.App.2d 569, 572, [equitable lien on divorce settlement proceeds].)

In this case, Wells Fargo had a perfected security interest in the assets and accounts, including accounts receivable, of J&W. "A holder of a security interest may maintain an action for the impairment of a security by a third party tortfeasor. [Citations.]" (*Baldwin v. Marina City Properties, Inc.* (1978) 79 Cal.App.3d 393, 403 [plaintiffs had security interest in limited partnership they sold to defendant to secure purchase money indebtedness].) Moreover, secured parties, although not owners, have a special interest with a right of possession in cases where there is a default and the security agreement allows the secured creditor to take possession. (*Id.* at p. 410.) As noted, the security agreement in this case allows for such possession. Accordingly, Wells Fargo was entitled to collect on its security interest at the time of J&W's default. However, the dissolution of J&W and the diversion of assets to JJR firm prevented Wells Fargo from collecting the outstanding debt. Although this claim necessarily relates to the Side Agreement, Wells Fargo is not, contrary to JJR's assertion, seeking tort damages for a breach of contract. Rather, this claim is based on the wrongful interference with Wells Fargo's security interest. The unauthorized retention of fees by JJR constituted an impairment of Wells Fargo's security interest, which was a conversion.

Cases holding that a conversion claim fails because the simple failure to pay money owed does not constitute conversion (see, e.g., *Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 284), are not applicable here, because in those cases, there was no taking of intangible property.

In sum, there was substantial evidence upon which the jury based its special verdict finding that JJR wrongfully converted Wells Fargo's security interest.

## III. DISPOSITION

The judgment is affirmed.  Wells Fargo is entitled to its costs on appeal.

_____
REARDON, J.


We concur:


_____
RUVOLO, P.J.


_____
RIVERA, J.