Filed 7/16/24  P. v. Miller CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yuba)

----

| | |
|---|---|
| THE PEOPLE, | C099340 |
| Plaintiff and Respondent, | (Super. Ct. No. CRF21-00797) |
| v. | |
| DAVID THEODORE MILLER, | |
| Defendant and Appellant. | |

After defendant David Theodore Miller pled guilty to two strike offenses, admitted a prior strike conviction, and violated his *Cruz* waiver,[1] he was sentenced to a stipulated term of 16 years in state prison.  On appeal, he contends the following errors occurred: (1) there was insufficient evidence he violated his *Cruz* waiver; (2) his defense counsel

---

[1]     Pursuant to *People v. Cruz* (1988) 44 Cal.3d 1247.

1

was ineffective for failing to call an alibi witness at the hearing; and (3) the trial court erred in imposing the upper term for one of his convictions. We disagree and affirm.

## FACTUAL AND LEGAL BACKGROUND

In January 2022, Miller pled no contest to second degree robbery (count 1; Pen. Code, § 211)[2] and dissuading a witness by force or threat (count 3; § 136.1, subd. (c)(1)). As to both counts, Miller admitted he had suffered one prior serious felony conviction under sections 667, subdivision (d) and 1170.12, subdivision (b). As part of the plea, Miller agreed to a *Cruz* waiver and sentencing was continued for one year. If Miller followed the terms of the waiver successfully, i.e., appearing at sentencing, not violating any laws, and not possessing weapons, the prior strike would be stricken from each count and he would be placed on a grant of formal probation with a suspended eight-year term, consisting of an upper term of five years plus a middle term of three years. If Miller was unsuccessful, he would serve the prison term, doubled to 16 years due to the prior strike convictions. Miller was then released on his own recognizance.

A year later, Miller failed to appear for the sentencing hearing. The *Cruz* waiver was revoked, and a bench warrant was issued for his arrest. The matter was set for a hearing on the violation of the *Cruz* waiver. On February 3, 2023, Miller was found in violation of his *Cruz* waiver.

On March 31, 2023, newly retained defense counsel filed a motion for a new trial on the ground that new material evidence was discovered. The prosecution filed written opposition. On June 15, 2023, the court denied the motion.

On June 28, 2023, the court sentenced Miller to 16 years in state prison, consistent with the agreement.

Miller filed a timely notice of appeal on August 28, 2023.

---

[2] Undesignated statutory references are to the Penal Code.

# DISCUSSION

## I

### *Violation of the Cruz Waiver*

Miller contends there was insufficient evidence to support the finding that he violated his *Cruz* waiver. We disagree.

### A. Additional Background

Subsequent to his plea, the prosecution filed new charges against Miller, alleging he committed first degree burglary (§§ 459, 460, subd. (a)), unauthorized entry of property (§ 602.5), and dissuading a witness (§ 136.1). These charges served as the basis for the allegation that he violated his *Cruz* waiver.

Sergeant Mark Carroll testified that shortly before 6:00 p.m. on the day of the incident, he spoke with T.J. and her father M.J., with whom she lived.[3] M.J. told Sergeant Carroll that Miller, T.J.'s mother's on-and-off boyfriend, has never been allowed in the house. T.J. told him that, about five minutes before she called the police, Miller entered her home three times. She identified Miller by name, nickname, and from a photo. She said that the first time he knocked on the door, entered, looked around, and then left. The second time he entered and looked from room to room calling her mother's name. While there, he asked T.J. about the whereabouts of her mother. On the third occasion, he entered with a baseball bat and again looked from room to room for T.J.'s mother. Sergeant Carroll described his interaction with T.J., saying she was shaking, crying, and her voice was cracking while she relayed the events.

---

[3] A preliminary hearing was held concurrently with the hearing on the *Cruz* waiver violation. For purposes of the violation hearing, the court considered Sergeant Carroll's testimony regarding T.J.'s and M.J.'s statements substantively, as prior inconsistent statements, only after they each testified.

Prior to her court testimony, T.J. met with district attorney investigator James Perrin. T.J. was with her mother and father. She told Perrin that she had previously lied and had not really seen who entered the house. Her mother was upset upon hearing that the charges could not be dropped without going to court. Prior to leaving the office, Perrin saw T.J. sobbing and being consoled by her father.

T.J. also met with district attorney investigator Brandt Lowe. Prior to meeting in person, Lowe called T.J. to speak about how to serve her and her father with a subpoena. Her mother took the phone and told Lowe that T.J. had previously lied. T.J. then said, "Mom, I did not." At that point, the phone call ended, and Lowe unsuccessfully attempted to re-establish contact. When Lowe eventually met with T.J., she told Lowe that she had not seen Miller at her house on the day of the incident and had just assumed he was the person entering her house. She said that she heard something hit the door frame and assumed it was a bat.

T.J.'s testimony was different than her statement to Sergeant Carroll. She testified that at the time of the incident, the front door to the house did not have a lock. She was home alone when someone came into her house. She heard someone hit the door hard and ask for her mother multiple times. She assumed it was Miller. She stayed in her room until the police arrived. She said she did not see or have contact with the person. She thought the person hit the door with a baseball bat because she heard the person strike the wall with something that sounded wooden. She heard the person bang on each of the bedroom doors. He never looked inside any of the rooms.

She admitted that when she spoke with Sergeant Carroll that same day, she told him that she saw Miller in her house, but claimed it was not true. She also agreed she told the officer that Miller came into the house three separate times. She also admitted that she told Sergeant Carroll that Miller came inside her house holding a wooden bat. She testified she never saw Miller in the house but assumed it was him. She said she

4

came to the district attorney's office more than once and repeatedly said she did not actually see Miller in the house.

Investigator Lowe testified that, while in jail, Miller communicated with a woman[4] about his case, instructing her how to ensure T.J. and her mother essentially "straightened out the lies" with counsel.

M.J. testified that he didn't give anyone permission to be in the house, and that he did not know if Miller had been there that day. He also testified that the lock to the front door was broken, and people frequently come and go. He testified that Miller had been to his home on many occasions and was always welcome. If he had known Miller would be there on that day, it would have been with permission.

At the conclusion of the hearing the court held Miller to answer on the underlying case and further found him in violation of the *Cruz* waiver.[5] The court found that Miller had entered with a weapon—a baseball bat—with the intent to commit a violent felony and therefore had violated his *Cruz* waiver. The court explained that Miller's intent was "obvious"; he "appeared to be angry, with a wooden bat, calling for [mother], and was looking from room to room."

*B. Analysis*

A defendant may plead guilty or no contest pursuant to a plea agreement and remain out of custody until sentencing pursuant to a so-called *Cruz* waiver. (*People v. Cruz, supra*, 44 Cal.3d at p. 1254, fn. 5; *People v. Masloski* (2001) 25 Cal.4th 1212, 1219-1224.) When the parties agree as part of the plea bargain to a specific sanction for

---

[4]    This woman was identified as S.H., a spectator whom the court admonished for making facial expressions during T.J.'s testimony.

[5]    The parties agreed the same arguments applied to the preliminary hearing as to the hearing on the violation of the *Cruz* waiver. The court noted the different standards were met as to each hearing.

5

noncompliance, the court may invoke the bargained-for sanction. (*People v. Casillas* (1997) 60 Cal.App.4th 445, 452.)

The question whether a defendant violated a condition of his or her release is determined by the trial court under a preponderance of the evidence standard and reviewed under the substantial evidence test. (*People v. Rabanales* (2008) 168 Cal.App.4th 494, 509.) " 'When a trial court's factual determination is attacked on the ground that there is no substantial evidence to sustain it, the power of an appellate court *begins* and *ends* with the determination as to whether, *on the entire record*, there is substantial evidence, contradicted or uncontradicted, which will support the determination . . . .' [Citation.] 'Deferential review is particularly necessary when, as here, the factual determination depends in part on judging a witness's credibility,' and we must uphold such a determination if it is supported by substantial evidence." (*Ibid*.) " '[W]e must consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].' " (*ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266.)

Miller argues that because T.J. testified she did not actually see him enter the house with or without a bat, there was insufficient proof that he violated any laws or other terms of the *Cruz* waiver. We disagree.

Immediately after the incident, T.J. told Sergeant Carroll that she saw Miller enter, enter again and speak to her, and enter a third time carrying a baseball bat. M.J. told Sergeant Carroll that Miller had never been allowed in his house. These statements were prior inconsistent statements considered for their truth, which the court found more credible than the witnesses' testimony. Substantial evidence supports the court's credibility determination. T.J. said the event happened five minutes before she called the police. When Sergeant Carroll arrived, T.J. was shaking and crying as she related the incident but identified Miller by name, nickname, and photo. In contrast, T.J.'s testimony

6

was given after her mother clearly expressed her desire to have the charges dropped against Miller and Miller enlisted the help of a third party to have T.J. and her mother straighten out the lies.

Substantial evidence also supports the conclusion that there was a preponderance of the evidence Miller violated the terms of his *Cruz* waiver when he committed an unauthorized entry into the house and/or a burglary while armed with a bat. The menacing nature of Miller's behavior increased each time he entered the house without permission. The first time Miller entered the house, he entered without permission, looked around, then left. The second time he entered, he went from room to room calling her mother's name. While there, he asked T.J. where her mother was. On the third occasion, knowing T.J. was in the house, he returned with a baseball bat and again looked from room to room for T.J.'s mother while he banged on doors with the bat. This evidence sufficiently established it was more probable than not that Miller entered the premises without permission (§ 602.5) and/or entered with the specific intent to commit a felony. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 998 [the preponderance of the evidence standard " ' "simply requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence' " ' "]; see also §§ 459, 460.)

II

*Miller's Alibi Witness*

Miller also contends his trial counsel was ineffective for failing to call an alibi witness at the hearing. We conclude Miller has not shown he was prejudiced by counsel's failure to do so.

*A. Additional Background*

After the hearing on the *Cruz* waiver violation, Miller obtained new counsel who filed a motion for a new trial. In the motion, Miller alleged in part that his trial counsel failed to investigate an alibi witness. Attached to the motion was a declaration from a man who said he helped fix Miller's car on the day of the incident, in Lucerne, California

7

and Miller was present when he did so. Also attached to the motion was a declaration from W.J., M.J.'s cousin, who claimed to be the person who entered the house on the day of the incident.

At the hearing on the motion for a new trial, Miller's trial counsel testified that Miller had told him about an alibi witness who could confirm that Miller was out of town at the time of the burglary. When asked if he had been given any identifying information for the witness, he answered that Miller said the person was in Lake County but that counsel's "understanding was that the alleged victim was going to come in and testify that she did not, in fact, see Mr. Miller at the residence. And from a strategic standpoint, I thought that's all we needed to beat the *Cruz* waiver hearing. So I didn't look further into the alibi witness." Counsel confirmed that Miller never actually provided information about the alibi witness, stating, "At that time we didn't know his whereabouts," and he wasn't sure of the likelihood he would be able to find this person in Lake County and bring him in to testify. From a strategy standpoint, counsel determined that T.J.'s testimony was sufficient to prove the defense.

W.J. also testified on behalf of Miller at the motion for a new trial. He said he was the person who entered the house and presented a Google timeline screenshot of the relevant day showing he was in the area of T.J.'s house between 4:27 and 4:39 p.m., nearly an hour and a half before Sergeant Carroll was dispatched to the house. He testified he entered the house and looked for M.J.; he did not call out for T.J.'s mother. This testimony contradicted his declaration attached to the motion for new trial, which stated he entered the house, called out for T.J.'s mother, and pounded on the wall.

The court found W.J. not credible and did not believe he was the person T.J. witnessed entering the house looking for her mother. The court found that the real version of events was relayed through T.J.'s statements to Sergeant Carroll.

8

*B. Analysis*

A motion for a new trial may be based on a claim of ineffective assistance of counsel. (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.) Such a claim requires a showing, by a preponderance of the evidence, of objectively unreasonable performance by counsel and a reasonable probability that, but for counsel's errors, Miller would have obtained a more favorable result. (*People v. Ledesma* (1987) 43 Cal.3d 171, 216-218.) A reasonable probability is one " 'sufficient to undermine confidence in the outcome.' " (*Id.* at p. 218, quoting *Strickland v. Washington* (1984) 466 U.S. 668, 693-694.) In reviewing the denial of a motion for a new trial raising ineffective assistance of counsel claims, we uphold the trial court's factual findings if they are supported by substantial evidence, and we exercise our independent judgment on the legal issues. (*People v. Taylor* (1984) 162 Cal.App.3d 720, 724-725.)

Miller's main argument is that counsel should have called the alibi witness from Lake County. Presumably he is referring to the man who provided a declaration stating that Miller was in Lake County on the relevant day. However, Miller did not produce this witness at the hearing on the motion for a new trial. Even assuming the truth of the contents of the declaration, the evidence that the witness presumably would have offered does not necessarily provide an alibi. In his declaration, the man stated: "I worked on the vehicle from March 5, 2022, through March 6, 2022 [the day of the incident]. During those two days, David Miller was present in and about my residence while I fixed his vehicle." As there are no specific times stated for the relevant day, the purported alibi information does not foreclose the possibility that Miller returned to Yuba County in the early evening and entered T.J.'s house without permission. Accordingly, Miller fails to persuade us that there is a reasonable probability that, but for counsel's failure to call the witness, he would have obtained a more favorable result.

III

*Miller's Stipulated Sentence*

Miller argues the trial court could not impose the upper term sentence because there is insufficient evidence of the aggravating factors relied upon to impose the upper term and because section 1170, subdivision (b), as amended by Senate Bill No. 567 (2021-2022 Reg. Sess.) (Senate Bill 567), prevents imposition of the upper term unless Miller stipulated to aggravating factors or the court found those factors true beyond a reasonable doubt. The People assert Miller's agreement to the stipulated sentence after the effective date of the amendments constitutes a forfeiture of the issue as well as a concession that there were legally sufficient facts to impose the upper term. Alternatively, section 1170, subdivision (b) is not implicated because the trial court did not exercise its discretion in imposing the stipulated sentence. We agree the issue is forfeited.

*A. Additional Background*

As previously noted, Miller entered into a negotiated plea. In exchange, the prosecution agreed to dismiss a charge for assault with means likely to produce great bodily injury (count 2; § 245, subd. (a)(4)), allegations of great bodily injury, and the five-year prior serious conviction allegations. If Miller was unsuccessful in complying with the conditions of the *Cruz* waiver, he would receive a stipulated state prison sentence of 16 years. At the time of the plea, the court stated: "But I don't want there to be any mistake. If he violates the *Cruz* waiver between now and the date of sentencing, he is looking at the full 18 years." Defense counsel corrected the court, stating the agreement was for 16 years, "[a]nd Mr. Miller just told me absolutely if he screws up on this *Cruz* waiver in the next year, he'll agree to 16 years." The court responded, "I'm going to write in 16 years here, and you are going to initial it, Mr. Miller." Miller replied, "Sounds good." An attachment to the plea agreement states in relevant part: "If I violate my *Cruz* waiver during the year before sentencing, I will receive ~~12~~ 16 years in state

prison (midterm in each count, doubled with the strike, fully consecutive). [¶] 'The waiver of jury trial right includes any matter related to sentencing on the case. Further, I agree that the aggravating factors in this case outweigh any mitigating factors and justify the Court imposing the upper term.' " The "~~12~~ 16" bears the handwritten initials "DM," consistent with Miller's name.

After he was found to have violated the *Cruz* waiver, the court sentenced Miller to 16 years in state prison. In imposing sentence, the court found: "On this matter the stipulation was that should the Court find a violation of the *Cruz* waiver, which the Court did, the stipulation was 16 years in the Department of Corrections. I'm noting that the plea form does contain attached to it the *Cruz* waiver. [¶] The waiver of jury trial right includes any matter related to sentencing on the case. Further, I agree that the aggravating factors in this case outweigh any mitigating factors and justify the Court imposing the upper term. [¶] Having reviewed the plea in this matter, 16 years is the stipulation. The way we get to that is the upper term then on the 211. The Court accepts the resolution reached between the parties. It is a stipulated sentence, and this is . . . Count 1, 211, 2nd degree robbery with a strike, 10 years upper term in the Department of Corrections. [¶] Fully consecutive to that is a violation of Penal Code 136.l(c)(1). . . . It's 136.l(c)(1), for which you can impose full consecutive sentencing, felony witness intimidation. So 6 years is imposed, consecutive. [¶] I accept the stipulation reached between the parties."

### B. *Analysis*

In reviewing a challenge involving a plea bargain, we apply the standards of review applicable to contracts generally. (*People v. Segura* (2008) 44 Cal.4th 921, 930.) " '[T]he "interpretation of a contract is subject to de novo review where the interpretation does not turn on the credibility of extrinsic evidence." ' " (*In re Ricardo C.* (2013) 220 Cal.App.4th 688, 696.)

11

Miller entered into a plea agreement in which he stipulated, upon unsuccessful compliance with his *Cruz* waiver, to a 16-year term (including one upper term) sentence in exchange for the dismissal of one charge and a great bodily injury allegation. At the sentencing hearing, the trial court confirmed that sentence and the parties agreed it should be imposed. The parties entered into the plea agreement on January 6, 2022, and the court imposed the sentence on June 28, 2023, well after Senate Bill 567 took effect on January 1, 2022. (Stats. 2021, ch. 731, § 1.3.) If Miller believed further establishment of the facts justifying imposition of the upper term was required, he had the opportunity to object to the trial court's imposition of the sentence to which he agreed. He did not do so, forfeiting his claim. As other Courts of Appeal have recognized, forfeiture applies where the defendant fails to object to an upper term sentence after the effective date of Senate Bill 567. (*People v. Hall* (2023) 97 Cal.App.5th 1084, 1101-1102, review granted Feb. 28, 2024, S283530; *People v. Achane* (2023) 92 Cal.App.5th 1037, 1047; *People v. Anderson* (2023) 88 Cal.App.5th 233, 241, review granted Apr. 19, 2023, S278786.)

Here, Miller not only failed to object to the trial court's pronouncement of sentence; rather, he actively bargained for the sentence the court imposed. The record establishes that he sought to be bound by the sentence if he did not comply with the terms of the *Cruz* waiver and the parties specifically clarified that the agreed-upon terms included an upper term for the robbery conviction. "[T]he specification of a maximum sentence or lid in a plea agreement normally implies a mutual understanding of the defendant and the prosecutor that the specified maximum term is one that the trial court may lawfully impose . . . ." (*People v. Shelton* (2006) 37 Cal.4th 759, 768.) Indeed, as the plea and sentencing took place after the effective date of the amendments to section 1170, we must presume the trial court and the parties were aware of the changes to section 1170. (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042; *People v. Barrett* (2012) 54 Cal.4th 1081, 1105 ["Counsel is presumed competent and informed as to applicable constitutional and statutory law"].)

In an attempt to avoid forfeiture, Miller argues that counsel provided ineffective assistance by failing to object to the imposition of the upper term. We disagree, concluding that Miller has not shown how counsel's performance in facilitating the terms of the plea and *Cruz* waiver were not actions that a reasonably competent attorney would undertake under the circumstances of this case. (See *Strickland v. Washington, supra*, 466 U.S. at pp. 687-688, 691-692 [to successfully show ineffective assistance of counsel, a defendant must show both deficient performance and resulting prejudice]; *People v. Ledesma, supra*, 43 Cal.3d at p. 215 [the right to counsel entitles a defendant to " 'the reasonably competent assistance of an attorney acting as his diligent conscientious advocate' "].) Nor has Miller presented any argument, or support for the conclusion, that it was reasonably probable that the trial court would have imposed anything less than the upper term on this record. (See *People v. Williams* (1997) 16 Cal.4th 153, 215; *Ledesma*, at pp. 217-218 [to demonstrate prejudice, a defendant must show that " 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome' "].) Accordingly, Miller's attempt to avoid forfeiture by claiming that his counsel was ineffective for failing to challenge the terms of his stipulated sentence fails.

13

**DISPOSITION**

The judgment is affirmed.

_/s/_

EARL, P. J.

We concur:

_/s/_

DUARTE, J.

_/s/_

WISEMAN, J.[*]

---

[*]      Retired Associate Justice of the Court of Appeal, Fifth Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.